**LINDE THOMSON LANGWORTHY KOHN & VAN DYKE, P.C.,**
Appellant,

v.

**RESOLUTION TRUST CORPORATION,**
Appellee.

No. 93–5131.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1993.

Decided Oct. 5, 1993.

R. Frederick Walters, Kansas City, MO, argued the cause and filed the briefs, for appellant. Deborah J. Jeffrey and Stephen H. Glickman, Washington, DC, entered appearances, for appellant.

James E. Topinka, San Francisco, CA, argued the cause, for appellee. With him on the brief were John H. Korns and Paul M. Laurenza, Washington, DC.

Before: MIKVA, Chief Judge, WALD and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Linde Thomson Langworthy Kohn & Van Dyke, P.C. ("Linde Thomson"), a former Kansas City law firm, appeals the district court's order enforcing a subpoena duces tecum issued by the Resolution Trust Corporation ("RTC"). Linde Thomson alleges that the district court erred in refusing to privilege certain communications with its insurer and in ordering production of documents that were irrelevant to the RTC's investigation and unduly burdensome to produce. Linde Thomson also argues that the civil suit filed by the RTC on May 3, 1993 terminated its investigation, thus rendering the subpoena enforcement proceedings moot. We affirm the district court's order enforcing the sub-

poena and hold that the supervening civil complaint did not terminate the RTC's investigation.

## I. BACKGROUND

This case is set against a backdrop of calamity in the savings and loan industry of startling proportions. In an attempt to superimpose order upon the mounting chaos of thrift insolvency, Congress created the RTC in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (codified as amended at 12 U.S.C. §§ 1441a, 1811 *et seq.*). Pursuant to its statutory authority, the RTC acts as receiver for hundreds of failed thrifts, succeeding to the entirety of each association's rights, assets, and obligations.[1] 12 U.S.C. § 1821(d)(2)(A), (B) (1989). The RTC is charged with maximizing the net present value of thrift assets, minimizing the impact of its transactions on local real estate and financial markets, and making efficient use of funds obtained from the government. 12 U.S.C. § 1441a(b)(3)(C) (1993). In its capacity as receiver, the RTC may, *inter alia*, avoid fraudulent asset transfers, 12 U.S.C. § 1821(d)(17) (1993), assert claims against the association's directors and officers, 12 U.S.C. § 1821(k) (1989), collect money due the association, 12 U.S.C. § 1821(d)(2)(B)(ii) (1989), and place the institution in liquidation, 12 U.S.C. § 1821(d)(2)(E) (1989). To facilitate the RTC's pursuit of such broad objectives, Congress empowered the RTC to issue administrative subpoenas when it conducts an investigation "for purposes of carrying out any power, authority or duty" under the statute. 12 U.S.C. §§ 1818(n), 1821(d)(2)(I) (1989).

On May 4, 1990, the Office of Thrift Supervision appointed the RTC receiver of the First Savings Bank & Trust ("FSB & T"), a Missouri savings and loan association. The RTC commenced an investigation into the failure of the thrift by an order of November 20, 1992. The order set forth the purposes of the investigation to

1. In 12 U.S.C. § 1441a(b)(4)(A) (1993), Congress granted the RTC "the same powers and rights to carry out its duties" as the Federal Deposit Insurance Corporation ("FDIC") has in 12 U.S.C. §§ 1821-1823 (1989).

determine whether (1) former owners, officers, directors, accountants, attorneys, appraisers and others who provided services to, or otherwise dealt with FSB & T, its predecessors, successors or affiliates may be liable as a result of any actions, or failures to act, in connection with or which may have affected FSB & T, its predecessors, successors or affiliates; (2) the RTC should seek to avoid a transfer of any interests or an incurrence of any obligations; (3) the RTC should seek an attachment of assets; and (4) pursuit of such litigation would be cost-effective, considering the extent of the potential defendant's ability to pay a judgment in any such litigation.

App. 2. Pursuant to this investigative order, the RTC issued a document subpoena on November 27, 1992 to Linde Thomson, a law firm with numerous connections to the failed thrift. Linde Thomson refused to comply with certain parts of the subpoena that requested information on asset transfers and liability insurance coverage and claims.[2]

On March 31, 1993, the RTC filed a petition in the United States District Court for the District of Columbia to enforce the subpoena. The district court ordered Linde Thomson to produce the requested insurance information, denying its assertion of an insured-insurer privilege under either state or federal law. The court permitted Linde Thomson to create a privilege log for documents arguably falling under the attorney-client privilege or work-product doctrine. The court also required production of the asset transfer information, disallowing Linde Thomson's objections on relevancy and burdensomeness grounds.

Linde Thomson appealed the district court's order, filing a motion for emergency stay with this court that was denied on May 4, 1993. Linde Thomson subsequently produced those documents pertaining to asset transfers that it had previously challenged on relevancy and burdensomeness grounds and, pursuant to this court's order, created a privilege log for documents within the scope of its asserted insured-insurer privilege.

On May 3, 1993, while Linde Thomson's appeal was pending before this court, the RTC filed suit against Linde Thomson and other parties associated with FSB & T in the United States District Court for the District of Missouri on a complaint alleging fraud, breach of fiduciary duty, and breach of contract. The RTC refused Linde Thomson's subsequent written request to withdraw the investigative subpoenas and to close its investigation.

At issue on appeal are the documents containing communications with Linde Thomson's insurer, which have yet to be produced, and the asset transfer documents, which have been produced, but which Linde Thomson seeks to recover.

## II. DISCUSSION

Linde Thomson challenges the district court's enforcement of the administrative subpoena on several grounds. *First,* it urges that the district court erred in refusing to apply Missouri law of privilege, under which many of the insured-insurer communications would be insulated from production as part and parcel of the attorney-client privilege. *See generally State ex rel. Cain v. Barker,* 540 S.W.2d 50 (Mo.1976). In the alternative, should federal law properly apply to the proceeding, Linde Thomson makes two very different arguments. It urges as an initial matter that principles of comity and the need for vertical uniformity require the application of the Missouri privilege as a matter of federal law, because the state privilege may be employed without cost to federal policies. Next, Linde Thomson argues that, irrespective of Missouri law, the general federal attorney-client privilege encompasses the insured-insurer communications at issue in this case. Linde Thomson argues that these documents are also protected under the federally recognized work-product doctrine. *Second,* Linde Thomson attempts to recover documents pertaining to asset transfers produced pursuant

---

**2.** The RTC also issued a subpoena to Miller Nelson Vohland & Associates, a Kansas accounting firm that provided audit services to FSB & T. Although Miller Nelson initially refused to comply with the subpoena on the same grounds claimed by Linde Thomson, it subsequently produced all documents, and is thus not a party to the present appeal.

to the district court's order on the grounds that the documents are irrelevant to the RTC's investigation and the requests were unduly burdensome. *Third,* Linde Thomson contends that the RTC's supervening civil complaint terminates its investigation and thus compels vacation of the district court's order. We consider these arguments in turn.

## A. *Insured–Insurer Communications*

### 1. *Application of State Privilege*

■ We assume at the outset that the Missouri law of attorney-client privilege would insulate some of Linde Thomson's insurance communications from production.[3] The issue for this court in evaluating Linde Thomson's claim that the state privilege applies to this subpoena enforcement proceeding is one of characterization. Federal Rule of Evidence 501[4] mandates the application of state privileges in civil actions or proceedings for which state law supplies the rules of decision and federal privileges for issues or proceedings arising under federal law. *See* FED.R.EVID. 501. Federal Rule of Evidence 1101(c) states that "[t]he rule with respect to privileges applies at all stages of all actions, cases, and proceedings." FED.R.EVID. 1101(c).

Linde Thomson argues, pursuant to Rule 1101(c), that an administrative investigation is merely a stage of subsequent litigation. According to this view, Missouri law of privilege controls in this particular subpoena enforcement proceeding, because the ultimate claims pursued by the RTC, as evidenced by its suit filed in the Missouri District Court, sound in state law violations. This argument rests on several assumptions. First, it presumes that a complaint will follow, inevitably, from the issuance of an administrative subpoena. Second, it assumes that the RTC directed its investigation *only* to the identification of possible state law violations, and that this intent was either manifest or somehow ascertainable. Finally, it equates the administrative investigation with a civil discovery mechanism. We disagree with Linde Thomson's underlying premises, and thus reject its conclusion.

Linde Thomson's claim suggests that the sole permissible purpose of RTC investigations is the determination of the existence of legal claims under state law. However, the RTC faces no such limitation. An investigation conducted by the RTC may conceivably neither culminate in litigation, nor be initially designed to inspire it. *See FTC v. Texaco, Inc.,* 555 F.2d 862, 874 (D.C.Cir.) (en banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). We cannot abide by an interpretation of Rule 1101(c) that requires an *ex ante* determination of what claims, if any, may eventually be pursued by an agency undertaking a broad investigation pursuant to its clear statutory mandate. *See* 12 U.S.C. § 1821(d)(2)(I) (1989). Although the RTC has now filed a complaint against Linde Thomson that focuses primarily on violations of state law, this complaint followed, rather than anticipated, the subpoena enforcement proceeding below. We look at the inquiry from the perspective of the district court, which proceeded without knowledge of any subsequently issued complaints. As we reasoned in *Texaco,* "in the pre-complaint stage, an investigating agency is under no obligation to propound a narrowly focused theory of a *possible* future case.... The court

---

**3.** Because of the conclusions that follow, we do not ascertain the scope of the Missouri privilege and its application to the insured-insurer communications at issue in this case. We do note, however, that the Missouri privilege does not appear to provide blanket immunity for *every* communication between an insured and his insurer. *See, e.g., State ex rel. Cain v. Barker,* 540 S.W.2d 50, 54–55 (Mo.1976).

**4.** Federal Rule of Evidence 501 provides as follows:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Su-preme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

FED.R.EVID. 501.

must not lose sight of the fact that the agency is merely exercising its legitimate right to determine the facts, and that a complaint may not, and need not, ever issue." 555 F.2d at 874 (emphasis in original).

▮ Unlike a discovery procedure, an administrative investigation is a proceeding distinct from any litigation that may eventually flow from it. *See EEOC v. Deer Valley Unified School Dist.*, 968 F.2d 904, 906 (9th Cir.1992); *EEOC v. University of Notre Dame du Lac*, 551 F.Supp. 737, 742 (N.D.Ind.1982), *rev'd on other grounds*, 715 F.2d 331 (7th Cir.1983). In enforcing a subpoena, our role is limited to evaluating whether the subpoena is for a lawful purpose, whether the documents requested are relevant to that purpose, and whether the demand is reasonable. *See FTC v. Texaco*, 555 F.2d 862, 872 (D.C.Cir.) (en banc) (citing *Endicott Johnson v. Perkins*, 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943), and *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946)), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). Resolution of these issues requires interpretation of the scope of subpoena authority under the enabling federal law. The nature of a subpoena enforcement proceeding, under common sense and precedents in this circuit and elsewhere, thus rests soundly in federal law, and federal law of privilege governs any restrictions on the subpoena's scope.[5] *See FTC*

*v. TRW, Inc.*, 628 F.2d 207, 210–11 (D.C.Cir. 1980) (applying federal law to evaluate a claimed "self-evaluative" privilege against compliance with an FTC subpoena); *Dole v. Milonas*, 889 F.2d 885, 889 n. 6 (9th Cir.1989) (applying federal law to determine scope of attorney-client privilege in proceeding to enforce administrative subpoena under ERISA); *United States v. Schoenheinz*, 548 F.2d 1389, 1390 (9th Cir.1977) (applying federal law to reject "employer-stenographer" privilege asserted against IRS subpoena); *Colton v. United States*, 306 F.2d 633, 636 (2d Cir.1962) (applying federal law to determine scope of attorney-client privilege in IRS investigatory proceeding), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). We therefore reject Linde Thomson's contention that state law applies to the privileged status of the documents at issue and proceed to the inquiry under federal law.

### 2. *Privilege Under Federal Law*

▮ Linde Thomson urges this court to apply the Missouri law of privilege because it can do so "at no substantial cost to federal substantive and procedural policy." *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y. 1976); *see also Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1061 (7th Cir.1981); *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979). In substance, Linde Thomson suggests that we give the law of a particular

5. In light of our conclusions, we need not address the argument that 12 U.S.C. § 1441a(*l*)(1) mandates the application of federal law in all proceedings to which the RTC is a party. This provision states that:

Notwithstanding any other provision of law, any civil action, suit, or proceeding to which the Corporation is a party shall be deemed to arise under the law of the United States, and the United States district courts shall have original jurisdiction over such action, suit, or proceeding.

*Id.* As the Third Circuit noted recently, "[u]nder *D'Oench, Duhme* [*& Co. v. FDIC*, 315 U.S. 447, 455, 62 S.Ct. 676, 678, 86 L.Ed. 956 (1942)], section 1441a(*l*)(1) alone would be enough to warrant application of federal common law" to determine the rights of parties to negotiable instruments when the FDIC or the RTC is a party. *Adams v. Madison Realty & Dev., Inc.*, 937 F.2d 845, 855 (3d Cir.1991). *See also RTC v. Remcor Div.*, No. 91–4152, 1992 WL 22450, at *3, 1992 U.S.Dist. LEXIS 1107, at *8 (E.D.Pa. Jan. 31,

1992) ("Where the RTC is a party the court should look to state law for guidance only after federal law has been exhausted."). As a California district court explained it, "RTC cases, like FDIC cases, 'arise under the laws of the United States.' 12 U.S.C. § 1441a(*l*)(1). That phrase is not merely jurisdictional. Although state law may be incorporated to provide a federal rule of decision, federal courts are not bound by state law, but 'may draw on the federal law merchant as a convenient source of reference.'" *RTC v. Bayside Developers*, 817 F.Supp. 822, 827 (N.D.Cal.1993) (citation omitted). *See generally United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) ("This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs."); *FDIC v. O'Melveny & Meyers*, 969 F.2d 744, 751 (9th Cir.1992) ("It is by now clear beyond doubt that federal, not state, law governs the application of defenses against FDIC.").

state persuasive effect as a matter of federal law. *See D'Oench, Duhme & Co., v. FDIC,* 315 U.S. 447, 471, 62 S.Ct. 676, 685, 86 L.Ed. 956 (1942) (Jackson, J., concurring). We decline the opportunity to adopt a particular state's privilege law where, as here, the documents in question are sought by a governmental agency with a nationwide mandate to redress matters of pressing public concern. We have previously recognized a strong public interest in having administrative investigations proceed "expeditiously and without impediment." *FTC v. TRW, Inc.,* 628 F.2d 207, 210 (D.C.Cir.1980). The serious risk that inconsistent state privilege rules might unduly constrict the RTC's discretion in contravention of its congressional mandate makes it abundantly clear that this is a situation in which state privileges may not be adopted costlessly. A uniform rule, rather than *ad hoc* borrowing, will better promote federal policy objectives.

Federal courts have never recognized an insured-insurer privilege as such. *See Petersen v. Douglas County Bank & Trust Co.,* 967 F.2d 1186, 1188 (8th Cir.1992); *Gottlieb v. Bresler,* 24 F.R.D. 371, 372 (D.D.C.1959); John P. Ludington, *Annotation, Insured–Insurer Communications as Privileged,* 55 A.L.R.4th 336 (1992). Moreover, as the Supreme Court has recently made clear, federal courts should not create evidentiary privileges lightly, "[i]nasmuch as '[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence.'" *University of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990) (quoting *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980) (citation omitted)). In evaluating a claimed peer-review privilege against compliance with an EEOC subpoena, the Supreme Court suggested that considerable reluctance should greet any attempt—as is made here—to fashion a privilege lacking in historical or statutory basis. *See University of Pennsylvania,* 493 U.S. at 195, 110 S.Ct. at 585. The imperative of caution appears even stronger in the administrative subpoena context, in which strong public interests in efficient investigation contend with the public policy rationale underlying evidentiary privileges. *See, e.g., FTC v. TRW, Inc.,* 628 F.2d 207, 210 (D.C.Cir.1980).

■ Perhaps recognizing the difficulties inherent in proposing a broad new privilege, Linde Thomson attempts to moor the protection for insured-insurer communications within the existing attorney-client privilege framework. Linde Thomson insists that the liability insurer acts as a "mere intermediate agent" in transmitting a communication pertaining to liability from the insured to attorneys. *See State ex rel. Cain v. Barker,* 540 S.W.2d 50, 54 (Mo.1976). Because we believe that this contention merits exploration, we turn to the scope of the federal attorney-client privilege.

This court adheres to the axiom that the attorney-client privilege must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Sealed Case,* 676 F.2d 793, 807 n. 44 (D.C.Cir.1982) (citing *In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir. 1979)). Because we have never been confronted with a claimed insured-insurer facet to the attorney-client privilege, we must extrapolate from precedent to determine whether protection for insured-insurer communications is coextensive with the "logic" of the attorney-client privilege "principle." The attorney-client privilege undeniably extends to communications with "one employed to assist the lawyer in the rendition of professional legal services." Supreme Court Standards 503(a)(3), 503(b), *cited in United States v. (Under Seal),* 748 F.2d 871, 874 n. 5 (4th Cir.1984). In *FTC v. TRW, Inc.,* 628 F.2d 207, 212 (D.C.Cir.1980), we explored the ambit of this logic. Tracing the line of cases beginning with Judge Friendly's opinion in *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961), we observed that the privilege logically encompassed "reports of third parties made at the request of the attorney or client where the purpose of the report was to put in usable form information obtained from the client." *TRW,* 628 F.2d at 212. We stressed that the critical factor for purposes of the attorney-client privilege was that the communication be made *"in confidence* for the purpose of obtaining *legal* advice *from the lawyer." Id.* (citing *Kovel,* 296 F.2d at 922)

(emphasis in original). We cited cases consistent with this limitation extending the attorney-client privilege to a psychiatrist hired by a defense lawyer to aid in an insanity defense, *United States v. Alvarez*, 519 F.2d 1036, 1045–1046 (3d Cir.1975), to an accountant hired by an attorney to assist the attorney in giving the client tax advice, *United States v. Cote*, 456 F.2d 142, 144 (8th Cir. 1972), and to an accountant who prepared a statement of a client's net worth at the attorney's request, *United States v. Judson*, 322 F.2d 460, 462–63 (9th Cir.1963). We cautioned restraint, however, lest the privilege be construed to engulf "all manner of services" that should not be summarily excluded from the adversary process. *TRW*, 628 F.2d at 212.

Armed with caution and an understanding that the privilege protects only those communications made for "the purpose of obtaining legal advice from the lawyer," *TRW*, 628 F.2d at 212 (citing *Kovel*, 296 F.2d at 922) (emphasis omitted), we now firmly reject any sweeping general notion that there is an attorney-client privilege in insured-insurer communications.[6] An insured may communicate with its insurer for a variety of reasons, many of which have little to do with the pursuit of legal representation or the procurement of legal advice. Certainly, where the insured communicates with the insurer for the express purpose of seeking legal advice with respect to a concrete claim, or for the purpose of aiding an insurer-provided attorney in preparing a specific legal case, the law would exalt form over substance if it were to deny application of the attorney-client privilege. However, a statement betraying neither interest in, nor pursuit of, legal counsel bears only the most attenuated nexus to the attorney-client relationship and thus does not come within the ambit of the privilege. To paraphrase the *Kovel* case, if what is sought is not legal advice, but insurance, no privilege can or should exist. See *Kovel*, 296 F.2d at 922.

### 3. *Privilege Under Federal Work–Product Doctrine*

■ Linde Thomson also urges that the insured-insurer communications fall within the ambit of the work-product doctrine. The work-product doctrine was first elaborated by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), in order to protect against unwarranted intrusion into the files and mental impressions of attorneys and to promote "the interests of clients and the cause of justice." *Id.* at 510–11, 67 S.Ct. at 393–94. The work-product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 864 (D.C.Cir.1980). As we observed in *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982), the scope of protection under work-product doctrine is broader than that under attorney-client privilege. *Id.* at 808. Federal Rule of Civil Procedure 26(b)(3), which applies to subpoena enforcement proceedings according to the terms of Rule 81(a)(3), extends protection to "documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, *insurer*, or agent)." FED.R.CIV.P. 26(b)(3) (emphasis added).

Despite the doctrine's apparent breadth, we have underscored its limitations, noting that "there is no privilege at all unless the document was initially prepared in contemplation of litigation, or in the course of preparing for trial." *Coastal States*, 617 F.2d at 865. A litigant must demonstrate that documents were created "with a specific claim supported by concrete facts which would likely lead to litigation in mind," *id.*, not merely assembled in the ordinary course of business or for other nonlitigation purposes. *See Petersen v. Douglas County Bank & Trust Co.*,

---

**6.** We note as an aside that an insurer frequently has its own interests, rather than the insured's interests, foremost in mind. Far from serving as the client's agent or the attorney's agent, the insurer is often an independent, primary actor.

It strains the analogy surely to compare the insurer to "a translator who puts the client's information into terms that the attorney can use effectively." *TRW*, 628 F.2d at 212.

967 F.2d 1186, 1189 (8th Cir.1992). Courts applying these standards have frequently declined to find insured-insurer communications within the penumbra of the work-product doctrine. *See, e.g., McDougall v. Dunn,* 468 F.2d 468, 473 (4th Cir.1972) (deeming dispositive the two and one-half year time lapse between statements to insurer and ensuing litigation); *Fann v. Giant Food, Inc.,* 115 F.R.D. 593, 596 (D.D.C.1987) (deeming insurance communications "ordinary business" even though it was apparent that litigation might eventuate).

■ The district court allowed Linde Thomson to create a privilege log for documents falling under the work-product doctrine. Although we reject any notion that insured-insurer communications *as such* warrant an extension of the federal work-product doctrine beyond its current confines, some insured-insurer communications obviously could surmount the considerable restrictions of the doctrine to merit protection. We believe that Linde Thomson received ample protection through the privilege log established by the district court below.

## B. *Documents Pertaining to Asset Transfers*

■ After the district court's order, Linde Thomson complied in full with the requests for documents pertaining to asset transfers. On appeal, Linde Thomson seeks the return of these documents. An appellant may challenge a subpoena following compliance without raising mootness problems when it seeks return of the tendered documents. *Office of Thrift Supervision v. Dobbs,* 931 F.2d 956, 958 (D.C.Cir.1991). If the records were wrongfully subpoenaed, Linde Thomson is entitled to their return. *See Id.* at 958; *FTC v. Browning,* 435 F.2d 96, 97–98 (D.C.Cir. 1970). We look therefore to the propriety of the district court's order enforcing the subpoena.

## 1. *Relevance*

■ Linde Thomson first argues that much of the requested information pertaining to asset transfers was irrelevant to the stated purposes of the RTC's investigation. An administrative subpoena is valid if the requested information is "reasonably relevant." *See FTC v. Invention Submission Corp.,* 965 F.2d 1086, 1089 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993); *FTC v. Anderson,* 631 F.2d 741, 745 (D.C.Cir.1979).[7] We measure this relevancy against the "general purposes of [the agency's] investigation," *FTC v. Texaco,* 555 F.2d 862, 874 (D.C.Cir.) (en banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), which necessarily presupposes an inquiry into the permissible range of investigation under the statute. The investigation's boundary may be defined quite generally. *See Invention Submission,* 965 F.2d at 1090. We have held that "the agency's own appraisal of relevancy must be accepted so long as it is not 'obviously wrong.'" *Id.* at 1089; *FTC v. Carter,* 636 F.2d 781, 787–88 (D.C.Cir.1980). Moreover, absent legal error, "[a] finding by the district court that documents are relevant and necessary to an inquiry ... is essentially factual in nature and cannot be overturned unless the district court's finding is clearly erroneous." *FTC v. Lonning,* 539 F.2d 202, 210 n. 14 (D.C.Cir.1976).

■ The relevancy inquiry turns on an examination of the RTC's order of investigation. In launching its argument, Linde Thomson relies on its perception that the RTC investigation had only two purposes: ascertaining the potential liability of Linde Thomson for the failure of FSB & T and determining whether it would be cost-effective to bring suit, if such liability existed. Because Linde Thomson believes it has provided ample information for resolution of these two inquiries, it perceives the additional requests as irrelevant. We believe that Linde Thomson's relevancy argument is predicated on an unduly restrictive interpre-

7. As we observed in *Anderson,* we have occasionally used an alternate formulation, "not plainly irrelevant." *See, e.g., FTC v. Carter,* 636 F.2d 781, 788 (D.C.Cir.1981). However, "the differ-ences between the formulations are chiefly semantical and are of no legal consequence." *Anderson,* 631 F.2d at 745 n. 4.

tation of the order of investigation that fails to account for its plainly broader scope. In addition to the two goals acknowledged by Linde Thomson, the RTC order also states the purposes of determining "whether ... the RTC should seek to avoid a transfer of any interests or an incurrence of any obligations ... [and whether] the RTC should seek an attachment of assets." App. 2. Like the gas producers in *Texaco,* Linde Thomson has posited an erroneous interpretation of the scope of the administrative inquiry and then sought to limit the investigation ·to the confines of this distorted interpretation. *See Texaco,* 555 F.2d at 874.

When the scope of the RTC investigation is determined by reference to the clear terms of the order, the relevancy of the requested asset transfer documents is plain. Under 12 U.S.C. § 1821(d)(17)(A) (1993), the RTC is authorized to avoid asset transfers motivated by an intent to hinder, delay, or defraud the insured thrift or the RTC. Section 1821(d)(18) allows the RTC to attach the assets of any person. Items two and three of the investigation order, therefore, mirror express statutory grants of power to the RTC. Pursuant to its statutory authority and the investigation order, the RTC sought production of asset transfer information from January 1991 to the present. Although this request may encompass transfers unrelated to FSB & T, the statute limits the RTC's inquiry only temporally, authorizing the RTC to freeze, and therefore, we conclude, to investigate, *any* transfer within a five-year period made with intent to defraud. At this stage of its investigation, the RTC need not tie the material it seeks to a particular theory of violation or to concrete facts suggesting fraud. *See Invention Submission,* 965 F.2d at 1090. We believe that "a wide range of ·investigation is necessary and appropriate where, as here, multifaceted activities are involved, and the precise character of possible violations cannot be known in advance." *Texaco,* 555 F.2d at 877. Accordingly, we reject Linde Thomson's relevancy challenge.

### 2. *Undue Burden*

■ Linde Thomson next claims that the request for these documents imposed undue burdens on the firm. This argument is again premised on Linde Thomson's erroneous in-

terpretation of the scope of· the RTC's investigation: *See generally Texaco,* 555 F.2d at 881–83. Because Linde Thomson sees little more to the investigative order than the determination of whether to pursue litigation and whether such litigation would be cost-effective, it perceives the requests for documents pertaining to asset transfers as unnecessary and, consequently, unreasonably oppressive. As stated above, we reject Linde Thomson's constrained interpretation of the range of permissible inquiry.

■ The burden of proving undue hardship "is not easily met where ... the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose." *Texaco,* 555 F.2d at 882. Every subpoena imposes a burden on its recipient. Because of the RTC's broad mandate, we are loath to accord the agency anything less than "extreme breadth" in conducting its investigation. *See Texaco,* 555 F.2d at 882 n. 51; *Genuine Parts Co. v. FTC,* 445 F.2d 1382, 1391 (5th Cir.1971). We see nothing in the RTC's request, limited as it is to a reasonable time-frame, to suggest undue disruption or serious hindrance of the normal operations of Linde Thomson's business. *See Texaco,* 555 F.2d at 882; *SEC v. Savage,* 513 F.2d 188, 189 (7th Cir.1975). As Linde Thomson freely admits, it had ceased operations as a law firm approximately one year and one-half before the RTC issued the order of investigation and subpoena. Because we perceive no further profound hardship, we affirm the district court's order enforcing the subpoena.

### C. *Supervening Civil Proceeding*

■ Linde Thomson's final argument is that the complaint filed by the RTC on May 3, 1993, served to terminate the investigation, thus rendering the subpoena enforcement proceeding moot. Linde Thomson rests this argument on its perception that the investigation by its terms was limited to determining the existence of legal claims and ensuring the cost-efficiency of filing suit. The RTC's decision to file a claim, according to Linde Thomson, establishes that the investigation has now run its course. We reject the argument that the investigation must terminate when litigation begins, because, as stated previously, we believe that Linde Thomson's argument is founded upon a fundamental

**1518**

misconception about the scope of the RTC's investigation. The clear language of the order of investigation leaves no room for the conclusion that this administrative subpoena lacks further purpose.

██ Nor does the statute authorizing RTC investigations contemplate the termination of investigative authority upon the commencement of civil proceedings. Without mention of substantive limitation, Congress empowered the RTC to issue administrative subpoenas to facilitate investigations "for purposes of carrying out *any* power, authority or duty" under the statute. 12 U.S.C. §§ 1818(n), 1821(d)(2)(I) (1989) (emphasis added). In *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court refused to enforce an IRS summons after the IRS had referred violations to the Department of Justice for criminal prosecution, on the grounds that the Internal Revenue Code itself terminated the IRS's investigative authority on referral. *Id.* at 312–13, 98 S.Ct. at 2365. In *SEC v. Dresser Industries*, 628 F.2d 1368 (D.C.Cir.) (en banc), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980), by contrast, this court permitted enforcement of an SEC subpoena even though a simultaneous criminal action pertaining to the same activity was underway before a federal grand jury. We distinguished the situations in *Dresser* and *LaSalle Nat'l Bank* based on the scope of the enabling statutes. *See id.* at 1378. Unlike the IRS, which was permitted to use the summons power for only four purposes, the SEC retained full powers of investigation under the pertinent statute even after a criminal proceeding was underway. *Id.* at 1379. In this case, as in *Dresser,* the investigative powers authorized by statute are unrestricted. Therefore, we may, and do, affirm the enforcement order of the district court below.[8] Several jurisdictions have employed a similar approach in enforcing administrative subpoenas after the commencement of other proceedings. *See, e.g., United States v. Frowein*, 727 F.2d 227, 231–

32 (2d Cir.1984); *United States v. Merit Petroleum, Inc.,* 731 F.2d 901, 904–05 (Temp.Emer.Ct.App.1984); *In re Stanley Plating,* 637 F.Supp. 71, 72–73 (D.Conn. 1986); *Sutro Bros. & Co. v. SEC,* 199 F.Supp. 438, 439 (S.D.N.Y.1961).

### III. CONCLUSION

Linde Thomson may not seek refuge in state laws of privilege against the directive of a valid administrative subpoena issued by the RTC. Its sole recourse must be to hew to the relatively rigorous standards of the federal attorney-client privilege and work-product doctrine. We reject Linde Thomson's argument that documents pertaining to asset transfers were irrelevant to the RTC's investigation and unduly burdensome to produce, because we find that this argument relies on an excessively restrictive view of the scope of the RTC's investigation. Lastly, the complaint filed on May 3, 1993 in no way affects the continued vitality of the RTC's subpoena. Accordingly, the order is

*Affirmed.*

---

**8.** Linde Thomson argues that enforcement of the subpoena will allow the RTC to circumvent discovery in its pending civil action. As we suggested in *OTC v. Dobbs,* 931 F.2d 956, 958 (D.C.Cir. 1991), this is not the proper occasion for challenge to a hypothetical future abuse of process.

Questions of suppression should not be considered until such time as the government seeks to use wrongfully obtained information. *See id.* (citing *United States v. Kis,* 658 F.2d 526, 533 (7th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982)).