**RESOLUTION TRUST CORPORATION, Appellee,**

v.

**Grant THORNTON, Appellant.**

**No. 94-5005.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1994.

Decided Dec. 16, 1994.

Rehearing and Suggestion for Rehearing In Banc * Denied Feb. 16, 1994.

* Randolf, Circuit Judge, did not participate in this matter.

Marc Gary, Washington, DC, argued the cause for appellant. With him on the briefs were James G. Duncan, Evan M. Tager, Washington, DC, and Stanley J. Parzen, Chicago, IL.

David M. Fitzgerald, Sr. Counsel, Resolution Trust Corp., Boston, MA, argued the cause for appellee. With him on the brief were Suzanne Rigby, Atty., Resolution Trust Corp., Paul M. Laurenza, John H. Korns, II, Washington, DC, and James E. Topinka, San Francisco, CA.

Before: EDWARDS, Chief Judge, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

In *FTC v. Invention Submission Corp.*, 965 F.2d 1086 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993), we recognized that administrative agencies may subpoena a corporation's financial documents solely to ascertain the cost-effectiveness of pursuing contemplated litigation against the corporation. Slightly more than a year later, in *Linde Thomson Langworthy Kohn & Van Dyke v. Resolution Trust Corp.*, 5 F.3d 1508 (D.C.Cir.1993), we held that, absent a governing statutory provision to the contrary, an agency's authority to subpoena documents in support of an investigation survives the agency's filing of a civil lawsuit against the target of the subpoena. And, most recently, in *Resolution Trust Corp. v. Walde*, 18 F.3d 943 (D.C.Cir.1994), we held that where personal (as opposed to corporate) records are at issue, an agency must harbor a reasonable articulable suspicion of wrongdoing before a cost-effectiveness purpose will be enforced via an investigative subpoena. This appeal presents a question unanswered by *Invention Submission Corp., Linde Thomson,* and *Walde:* whether an administrative agency's authority to subpoena documents from a partnership solely to ascertain the cost-effectiveness of litigation survives the agency's filing of suit against the subpoena recipient.

In this case, Grant Thornton, an accounting partnership, appeals from an order of the District Court enforcing two subpoenas duces tecum issued by the Resolution Trust Corporation ("RTC") pursuant to the agency's investigation of two failed savings associations, San Jacinto Savings Association ("San Jacinto") of Bellaire, Texas, and Cobb Federal Savings Bank ("Cobb Federal") of Marietta, Georgia. In the subpoenas, the RTC sought a broad variety of Grant Thornton's financial and insurance information for the asserted purpose of determining the cost-effectiveness of pursuing litigation against Grant Thornton. Four days after seeking enforcement of the subpoenas in the District Court, the RTC sued Grant Thornton in connection with the San Jacinto investigation, alleging misconduct in Grant Thornton's auditing of the institution and seeking reim-

bursement for the savings association's losses. Approximately six weeks later, the District Court entered an order enforcing both subpoenas.

We reverse the District Court's decision with regard to the San Jacinto subpoena. We hold that the RTC lacks statutory authority to subpoena financial documents solely to ascertain the cost-effectiveness of pursuing litigation once such litigation commences. While the RTC relies upon its general statutory authority to maximize the assets of failed savings institutions, minimize losses, and make efficient use of funds, we find these statutory mandates insufficiently specific to confer a power that would stretch beyond both the traditional boundaries of an investigation and the well-established limits on discovery of an adversary's financial and insurance information during the course of litigation. Thus, we conclude that the filing of suit by the RTC in this case terminated the agency's investigation into the cost-effectiveness of pursuing litigation against Grant Thornton.[1] As to the Cobb Federal subpoena, we remand to the District Court for a determination of privilege and privacy issues.

## I. BACKGROUND

Congress created the RTC in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. §§ 1441a, 1811 *et seq.* (1988 & Supp. V 1993) ("FIRREA"), as part of a comprehensive response to the nationwide collapse of the savings and loan industry. Under the FIRREA, the RTC acts as a receiver for hundreds of failed savings and loan institutions, succeeding to "all rights, titles, powers, and privileges" of such institutions. *Id.* §§ 1821(c)(6)(A), 1821(d)(2)(A)(i). As a receiver, the RTC is authorized to perform a variety of functions, including collecting all obligations and money owed to failed institutions, and preserving

and conserving their assets and property. *Id.* § 1821(d)(2)(B). Congress charged the RTC with performing all of its duties so as to maximize the value of the assets of failed institutions, minimize the losses realized in the resolution of cases, and make efficient use of public funds. *Id.* § 1441a(b)(3)(C). To facilitate these functions and others, the FIRREA authorizes the RTC to issue subpoenas "for purposes of carrying out any power, authority, or duty" under the statute. *Id.* §§ 1818(n), 1821(d)(2)(I)(i).

Exercising this power, the RTC issued a subpoena duces tecum to Grant Thornton on November 6, 1992, in connection with its investigation of San Jacinto, a failed institution to which Grant Thornton provided auditing services for fiscal years 1983 to 1988. According to an order of investigation signed that same day, the agency issued the San Jacinto subpoena to determine whether "pursuit of ... litigation [against Grant Thornton] would be cost-effective, considering the extent of the potential defendant's ability to pay a judgment in any such litigation." *In re San Jacinto Savings & Loan Ass'n,* Order of Investigation at 1 (Nov. 6, 1992) [hereinafter Order of Investigation], *reprinted in* Joint Appendix ("J.A.") 6.[2] The subpoena sought a broad range of financial and insurance information, including Grant Thornton's present financial statements and projections of future earnings through 1996; documentation of all insurance claims relating to any of Grant Thornton's engagements since 1983; internal organizational documents of any insurers in which Grant Thornton holds an ownership interest; all of Grant Thornton's partnership agreements since 1983, as well as statements of current firm income to each partner; full documentation of Grant Thornton's professional liability coverage, malpractice coverage, and loss reserves; and all documents created since 1990 discussing "the ability of Grant Thornton to pay potential judgments

---

**1.** We need not decide whether the records of Grant Thornton, a partnership, are more akin to corporate or personal records, because we find the agency to be without statutory authority to pursue its cost-effectiveness purpose after suit has been filed.

**2.** The orders of investigation underlying both the San Jacinto and Cobb Federal subpoenas listed

three additional purposes for the investigation. *See, e.g.,* Order of Investigation at 1, *reprinted in* J.A. 6. However, the RTC never has relied on any of the other purposes to justify enforcement, and counsel for the agency acknowledged at oral argument that the subpoenas served solely to allow the RTC to determine whether litigating against Grant Thornton would be cost-effective.

or settlements that may become due before January 1, 1995." J.A. 13–15. The subpoena was the second the RTC had issued to Grant Thornton since becoming the receiver for San Jacinto in November 1990. Pursuant to a September 1991 subpoena, Grant Thornton gave the RTC various documents relating to Grant Thornton's audits of San Jacinto, including its indemnity policies for the years relevant to its San Jacinto work.

In response to the second San Jacinto subpoena, Grant Thornton initially attempted unsuccessfully to persuade the RTC to alter or withdraw its demands. Then, in January 1993, Grant Thornton partially complied with the subpoena, producing recent financial statements, balance sheets, budget information, and tax returns; individual partner earnings summaries from 1990 to 1992; credit agreements between Grant Thornton and its lenders; and insurance policies covering the years during which Grant Thornton served as auditor for San Jacinto. The RTC reminded Grant Thornton of its remaining obligations under the San Jacinto subpoena in a letter dated July 28, 1993. In that letter, the agency also demanded reimbursement from Grant Thornton for at least $280 million worth of San Jacinto's losses. On November 15, 1993, the RTC sent Grant Thornton another letter, this time demanding compliance with the subpoena and threatening an enforcement action. On November 22, 1993, the RTC filed the threatened enforcement action in the District Court. Four days later, the RTC sued Grant Thornton in the United States District Court for the Southern District of New York, seeking the previously demanded $280 million as damages.

Meanwhile, the RTC also sought information from Grant Thornton in connection with the agency's investigation of Cobb Federal. On October 12, 1993, the RTC issued a subpoena duces tecum to Grant Thornton seeking insurance policies covering the same period as the request issued in connection with the San Jacinto investigation. Like the order of investigation underlying the San Jacinto subpoena, the order underlying the Cobb Federal subpoena asserted the purpose of determining whether litigation against Grant Thornton would be cost-effective. Because the two subpoenas overlapped, the RTC also requested enforcement of the Cobb Federal subpoena in the San Jacinto subpoena enforcement action.

The District Court granted the RTC's motion for summary enforcement of both subpoenas on January 10, 1994. *See* Hearing Tr. (Jan. 10, 1994) at 22, *reprinted in* J.A. 87. The District Court concluded that the subpoenas served the valid investigative purpose of allowing the RTC to determine the cost-effectiveness of litigating against Grant Thornton, and that our decision in *Linde Thomson* foreclosed Grant Thornton's argument that the RTC's filing of suit terminated that purpose. *Id.* at 22–24, *reprinted in* J.A. 87–89. The District Court thus ordered Grant Thornton to comply with the subpoenas or produce a log of privileged documents by January 31, 1994. *Id.* at 31, *reprinted in* J.A. 96. We stayed the District Court's order pending this appeal.[3]

On appeal, Grant Thornton raises three challenges to the District Court's enforcement order. First, with regard to the San Jacinto subpoena, Grant Thornton argues that the RTC has no statutory authority to subpoena financial and insurance information to ascertain the cost-effectiveness of pursuing litigation after such litigation has commenced. Second, Grant Thornton argues that both subpoenas are overbroad in that they seek documents that are not relevant to the RTC's investigative purposes. Finally,

---

**3.** Since the District Court's decision, the RTC has unilaterally narrowed the scope of the San Jacinto subpoena. In its brief to this Court, the RTC dropped its demands for projections of Grant Thornton's future earnings; financial statements of companies owned or controlled by Grant Thornton, or affiliated with Grant Thornton; and information on claims made against Grant Thornton's insurance policies, except information regarding claims related to San Jacinto, so long as Grant Thornton provides information showing the remaining coverage amounts under its insurance policies. *See* Brief of Appellee RTC at 4. Further, at oral argument, the RTC dropped its request for statements of current firm income to each of Grant Thornton's partners. Nonetheless, Grant Thornton continues to oppose enforcement. *See* Reply Brief for the Appellant at 1.

with regard to the Cobb Federal subpoena, Grant Thornton contends that the RTC lacks an "articulable suspicion" that Grant Thornton engaged in wrongdoing in its work for Cobb Federal, as required by our recent decision in *Walde,* and therefore that the agency may not subpoena information relevant to wealth rather than liability.[4]

## II. ANALYSIS

### A. *Applicable Law*

 Administrative agencies wield broad power to gather information through the issuance of subpoenas. Like a grand jury, an agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950). Accordingly, "the court's role in a proceeding to enforce an administrative subpoena is a strictly limited one." *FTC v. Texaco, Inc.,* 555 F.2d 862, 871–72 (D.C.Cir.) (*en banc*), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). We consider only whether "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Morton Salt Co.,* 338 U.S. at 652, 70 S.Ct. at 369. If an agency's subpoena satisfies these requirements, we must enforce it. *Id.; see also Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 505–06, 90 L.Ed. 614 (1946); *Texaco,* 555 F.2d at 872.

██ While our role is circumscribed, however, our function in conducting the narrow inquiry with which we are charged is "neither minor nor ministerial." *Walling,* 327 U.S. at 217 n. 57, 66 S.Ct. at 509–10 n. 57. In particular, our cases reflect the importance of a searching analysis where an agency subpoenas financial information for the sole purpose of ascertaining the cost-effec-

tiveness of pursuing litigation. We acknowledged the general validity of this investigative purpose in *Invention Submission Corp.,* 965 F.2d at 1090, where we held that the FTC could subpoena *corporate* financial information because such information was relevant to the agency's general investigation into possible unfair or deceptive trade practices by the recipient of the subpoena. Specifically, we found that "[c]omparison of [the subpoena recipient's] profits with those of other ... companies, and of the revenues of the corporation's various regional sales offices with one another ... might help the Commission to allocate its limited investigative resources to protect the largest number of consumers from potential harm." *Id.; see also Appeal of FTC Line of Business Report Litigation,* 595 F.2d 685, 702 (D.C.Cir.) (enforcing administrative subpoena of business data where agency sought information "[t]o choose as wisely as possible which industry-wide investigations best serve the public interest") (internal quotations omitted), *cert. denied,* 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978). Although our discussion in *Invention Submission Corp.* focused on use of the subpoena power to ascertain the most efficient allocation of the agency's investigative resources, we think this purpose is broad enough to encompass the determination whether contemplated litigation would be cost-effective.

██ However, while we have approved use of the administrative subpoena power for this purpose, we have not given agencies *carte blanche* in the exercise of that power. For example, although an agency may subpoena *corporate* financial information solely to ascertain the cost-effectiveness of contemplated litigation, it is less free to subpoena *personal* financial information for the same purpose. Relying on the Fourth Amendment's protection of the privacy interest that inheres in

---

4. Grant Thornton also argues that the order of investigation authorizing the San Jacinto subpoena provides no authority for enforcement after litigation has commenced. Noting the order's stated investigatory purpose of determining whether "pursuit of ... litigation would be cost-effective, considering the extent of the potential defendant's ability to pay a judgment in any such litigation," Order of Investigation at 1, *reprinted*

*in* J.A. 6, Grant Thornton argues that the order's reference to "the potential defendant" precludes the RTC from enforcing the subpoena once an *actual* defendant exists. Arguably we should not ascribe such significance to this chance wording. It may be that the word choice "potential defendant" signifies nothing more than the natural phrasing of an order issued prior to the filing of any litigation.

personal papers, we held in *Walde*, 18 F.3d at 949, that an agency may not subpoena "information relevant to wealth rather than liability" from a private person unless it has an "articulable suspicion" that "the target [of the subpoena] engaged in wrongdoing." More significantly for this case, we never have held that an agency's authority to subpoena even corporate financial information solely to assess the cost-effectiveness of litigation extends beyond the initiation of civil proceedings against the subpoena recipient. Indeed, in *Invention Submission Corp.*, we were careful to note that the FTC "ha[d] not yet even issued a complaint" in the case, and we explicitly declined to address the question "whether financial data can be obtained for the purpose of determining the feasibility of *redress*." 965 F.2d at 1089 (emphasis in original). We now turn to that question.

B. *The San Jacinto Subpoena*

In considering Grant Thornton's challenge to the San Jacinto subpoena, we first must decide whether Grant Thornton's arguments are foreclosed—as the RTC vociferously contends they are—by our recent decision in *Linde Thomson*. In *Linde Thomson*, a law firm challenging enforcement of an RTC subpoena argued, *inter alia*, that the RTC's filing of a civil complaint terminated the agency's investigation into the existence of legal claims and the cost-effectiveness of filing suit, and, therefore, also mooted a subpoena issued in furtherance of that investigation. 5 F.3d at 1517. We rejected that argument for two reasons. First, we referred to our conclusion, reached earlier in the opinion, that two of the subpoena's investigative purposes—determining whether the RTC should seek to avoid the transfer of interests or incurrence of obligations, and determining whether the RTC should seek to attach assets—remained viable even after civil proceedings began.[5] *Id.* at 1517–18. Second, we found that "the statute authorizing RTC investigations [does not] contemplate the termination of investigative authority upon the commencement of civil proceedings." *Id.* at 1518. The RTC argues that here, as in *Linde Thomson*, the purpose that animated the subpoena when it issued in November 1992—*i.e.*, determining the cost-effectiveness of contemplated litigation—continues to justify enforcement. In the RTC's view, the fact that suit subsequently has been filed is mere happenstance. We disagree.

[redacted] We perceive an important difference between this case and *Linde Thomson*. Unlike the subpoena at issue in *Linde Thomson*, the only purpose served by the San Jacinto subpoena is the determination whether pursuing litigation would be cost-effective. While we recognized in *Linde Thomson* that the RTC continues to exercise investigative authority after the commencement of civil proceedings, we did so only after finding that two of the subpoena's purposes, both related to uncovering further wrongdoing by the

5. Specifically, we stated:

> Linde Thomson's final argument is that the complaint filed by the RTC on May 3, 1993, served to terminate the investigation, thus rendering the subpoena enforcement proceeding moot. Linde Thomson rests this argument on its perception that the investigation by its terms was limited to determining the existence of legal claims and ensuring the cost-efficiency of filing suit. The RTC's decision to file a claim, according to Linde Thomson, establishes that the investigation has now run its course. We reject the argument that the investigation must terminate when litigation begins, because, as stated previously, we believe that Linde Thomson's argument is founded upon a fundamental misconception about the scope of the RTC's investigation. The clear language of the order of investigation leaves no room for the conclusion that this administrative subpoena lacks further purpose.

*Linde Thomson*, 5 F.3d at 1517–18. Earlier in our opinion, in discussing Linde Thomson's challenge to the relevance of documents subpoenaed by the RTC, we had stated:

> In launching its argument, Linde Thomson relies on its perception that the RTC investigation had only two purposes: ascertaining the potential liability of Linde Thomson ... and determining whether it would be cost-effective to bring suit, if such liability existed.... We believe that Linde Thomson's relevancy argument is predicated on an unduly restrictive interpretation of the order of investigation that fails to account for its plainly broader scope. In addition to the two goals acknowledged by Linde Thomson, the RTC order also states the purposes of determining "whether ... the RTC should seek to avoid a transfer of any interests or an incurrence of any obligations ... [and whether] the RTC should seek an attachment of assets."

*Id.* at 1516–17.

subpoena recipient, remained viable after suit was filed. *See Walde*, 18 F.3d at 950 (characterizing *Linde Thomson* as enforcing subpoena after commencement of civil proceedings "because ongoing investigation might reveal information to underpin further charges"). The very fact that we relied on these continuing investigative purposes to affirm the district court's enforcement order strongly suggested that the purpose of ascertaining the cost-effectiveness of litigation could not sustain the subpoena after civil proceedings began. Thus, while our *Linde Thomson* decision does establish that the commencement of civil proceedings fails to extinguish a subpoena supported by viable investigative purposes, it does not establish that ascertaining the cost-effectiveness of suit is such a purpose.

■ We now make clear what was implicit in *Linde Thomson*: the purpose of ascertaining the cost-effectiveness of pursuing litigation terminates once suit is filed. Indeed, there is a fundamental illogic to the RTC's argument that it requires Grant Thornton's financial and insurance information to determine the cost-effectiveness of pursuing litigation after litigation has begun. By filing suit against Grant Thornton, the RTC has made known its conclusion that such litigation is likely to be cost-effective. Enforcement of the subpoena at this juncture would serve only to allow the RTC to monitor the cost-effectiveness of its ongoing lawsuit.[6] The RTC cites no case, and we know of none, to support such an unprecedented use of the administrative subpoena power.

■ Nor can we discern any grant of authority in the FIRREA to subpoena documents for this purpose. The RTC emphasizes that the FIRREA authorizes it to issue subpoenas in furtherance of "any power, authority, or duty" under the statute, 12 U.S.C. § 1821(d)(2)(I)(i), and that such duties include "maximiz[ing] the net present value return from the sale ... of ... assets of [failed savings] institutions," "mak[ing] effi-

cient use of funds obtained from the ... Treasury," and "minimiz[ing] the amount of any loss realized in the resolution of cases," 12 U.S.C. § 1441a(b)(3)(C)(i), (iii), (iv). However, while the scope of this statutory language is broad, it also is general. We find it unreasonable to construe this general language to confer such an unprecedented power. We must emphasize that a subpoena is a tool of investigation. To construe the FIRREA to authorize the use of such a tool to monitor the cost-effectiveness of ongoing litigation would be to impute to Congress the intent to bestow a power that conflicts with two long-standing principles limiting the use of legal process to investigate, and discover.

■ First, the RTC's asserted authority conflicts with the general principle that an investigation terminates once suit has been filed. Because an administrative agency's subpoena power is analogous to that of a grand jury, *see Morton Salt Co.*, 338 U.S. at 642–43, 70 S.Ct. at 363–64; *Walling*, 327 U.S. at 216, 66 S.Ct. at 509, the law governing grand juries provides a particularly apt illustration of this principle. While a grand jury wields broad investigatory powers prior to returning an indictment, courts uniformly have held that, "[o]nce a targeted individual has been indicted, the government must cease its use of the grand jury in preparing its case for trial." *United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir.1993), *cert. denied*, ―― U.S. ――, ――, 114 S.Ct. 1070–71, 127 L.Ed.2d 389 (1994); *see also, e.g., United States v. Badger*, 983 F.2d 1443, 1458 (7th Cir.), *cert. denied*, ―― U.S. ――, 114 S.Ct. 76, 126 L.Ed.2d 44 (1993); *United States v. Jenkins*, 904 F.2d 549, 559 (10th Cir.), *cert. denied*, 498 U.S. 962, 111 S.Ct. 395, 112 L.Ed.2d 404 (1990); *United States v. Vanwort*, 887 F.2d 375, 387 (2d Cir.1989), *cert. denied*, 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 290 (1990), *and cert. denied*, 495 U.S. 910, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990); *In re Grand Jury Proceedings (Diamante)*, 814 F.2d 61, 70 (1st Cir.1987); *United States v. Moss*, 756 F.2d 329, 332 (4th

---

6. Indeed, this is the purpose the RTC asserted at oral argument before both the District Court and this Court. *See, e.g.,* Tr. of Hearing (Jan. 10, 1994) at 16–17, *reprinted in* J.A. 81–82 ("[W]e may very well find ... that we do not have enough of an asset base in terms of the insurance to pursue the litigation. It may very well affect a decision whether to continue to pursue that litigation or not.").

Cir.1985); *In re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1041 (3d Cir. 1980); *United States v. Sellaro*, 514 F.2d 114, 122 (8th Cir.1973), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *United States v. Star*, 470 F.2d 1214, 1217 (9th Cir.1972); *Beverly v. United States*, 468 F.2d 732, 743 (5th Cir.1972); 2 Sara S. Beale & William C. Bryson, Grand Jury Law and Practice § 10:15 (1986) ("It is universally recognized that it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial."); Paul S. Diamond, Federal Grand Jury Practice and Procedure § 4.01[C] (1991 Supp.) (stating that most common misconduct associated with grand jury investigations is "the abuse of the jury to gather evidence for a pending indictment"). Although an exception to this rule allows the Government to "continue to employ the grand jury process as part of an ongoing investigation, possibly leading to further charges against the subject of the former indictment," *Phibbs*, 999 F.2d at 1077, this exception embodies nothing more than the criminal law analogue to the principle we recognized in *Linde Thomson*—i.e., that an agency's investigative powers survive the commencement of litigation where the agency seeks to uncover *additional wrongdoing*. However, the more far-reaching power asserted by the RTC here—a power that effectively would allow the RTC to use subpoenas in aid of ongoing litigation—is utterly foreign to the law defining the traditional scope of investigative authority.

■ The RTC's asserted power also conflicts with well-established limits on a litigant's ability to discover an adversary's financial and insurance information. The federal discovery rules generally prohibit a litigant from discovering an opponent's assets "until after a judgment against the opponent has been rendered." *FTC v. Turner*, 609 F.2d 743, 745 (5th Cir.1980); *accord Sanderson v. Winner*, 507 F.2d 477, 479–80 (10th Cir.1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975); *RTC v. Feffer*, 793 F.Supp. 11, 14 (D.D.C.1992); *cf.* Fed. R.Civ.P. 69(a) (allowing discovery in aid of judgment). With regard to an opponent's insurance information, the Federal Rules of Civil Procedure specifically provide for disclosure only of "any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment." Fed.R.Civ.P. 26(a)(1)(D). The RTC's claimed power would enable it to evade both of these limitations. Even after unilaterally restricting the scope of its San Jacinto subpoena, the agency still seeks a broad variety of information from Grant Thornton to which it would have no right under the discovery rules. For example, the RTC continues to seek *all* of Grant Thornton's professional liability or malpractice policies; *all* of Grant Thornton's agreements of self-insurance, co-insurance, or re-insurance; and documentation detailing Grant Thornton's remaining coverage under such policies or agreements from January 1, 1983, to the present. *See* Brief of Appellee RTC at 4. Such information is well outside the bounds of the disclosure required by Rule 26(a)(1)(D). We see no reason to accord such special treatment to the agency once litigation has begun. The Supreme Court has stated that "[t]he Government as a litigant is ... subject to the rules of discovery," *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958), and we find no evidence that Congress meant to discard this principle through its general pronouncements in the FIRREA.

■ We recognize, as the RTC points out, that we have on several occasions held that a prospective conflict between an administrative subpoena and the civil discovery rules provides no basis for refusing to comply with the subpoena. *See Walde*, 18 F.3d at 950 ("If information is wrongly obtained through an administrative subpoena and used in a subsequent civil or criminal proceeding, the subpoenaed party remains free to challenge the use of the information in the appeal from *that* proceeding.") (internal quotations omitted); *see also Linde Thomson*, 5 F.3d at 1518 n. 8; *Office of Thrift Supervision v. Dobbs*, 931 F.2d 956, 959 (D.C.Cir.1991). However, we are here concerned not with the question of whether to invalidate a subpoena

based on the potential for circumvention of the discovery rules, but rather with what motives may reasonably be imputed to the Congress that enacted the FIRREA. In conducting a similar inquiry under the FIRREA in *Walde*, 18 F.3d at 948–49, we found personal privacy interests protected by the Fourth Amendment to preclude any interpretation of the statute that would allow the RTC to peruse the personal papers of individuals in the absence of an articulable suspicion of wrongdoing. We reached this conclusion despite the fact that the Fourth Amendment generally presents little obstacle to the enforcement of administrative subpoenas. *See Walling*, 327 U.S. at 208, 66 S.Ct. at 505 (stating that Fourth Amendment, "if applicable [to administrative subpoenas], at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant"). Similarly, here, while a conflict with the clear limits imposed by the discovery rules does not by itself invalidate the subpoena, it does inform our assessment of whether Congress intended to grant the RTC such an unprecedented subpoena power through the FIRREA. Having found nothing in the statute to support the power urged by the RTC, and having found that such a power would conflict with two well-established principles of federal law, we hold that the FIRREA confers no power on the RTC to subpoena information for the purpose of ascertaining the cost-effectiveness of litigation after the agency files suit against the subpoena recipient.

If cost-effectiveness is a relevant purpose and there is a legitimate basis for obtaining information relevant to that purpose in conjunction with a given investigation, the RTC has ample time to secure the information before filing suit. The RTC has suggested that the statute of limitations governing its claims sometimes forces it to file suit before completing an assessment of the cost-effectiveness of litigation. We find no basis for this claim. From the time the RTC is appointed to act as the receiver for a failed financial institution, the agency generally has three years to file tort claims on behalf of the institution. *See* 12 U.S.C. § 1821(d)(14)(A)(ii)(I) (Supp. V 1993). District courts typically take up the RTC's enforcement motions without delay. In this case, for example, the District Court ordered enforcement of the subpoenas within two months after the RTC filed its enforcement action. It seems clear that in the vast majority of cases, the RTC can obtain the information necessary to make its cost-effectiveness determinations before it is required to file suit.[7]

## C. The Cobb Federal Subpoena

■ Our holding that the San Jacinto subpoena is unenforceable has no bearing on the validity of the Cobb Federal subpoena. Unlike the situation surrounding the San Jacinto subpoena, the RTC has filed no litigation regarding Grant Thornton's work for Cobb Federal. Nonetheless, we remand the District Court's order enforcing the Cobb Federal subpoena for further proceedings. The District Court's enforcement order directed Grant Thornton to produce either the subpoenaed documents or a privilege log with respect to any documents for which Grant Thornton asserts attorney-client or work product privileges. Grant Thornton may pursue its claims of privilege on remand. In addition, Grant Thornton argues that, as the records of a partnership, the documents sought in the Cobb Federal subpoena are equivalent to personal records, and thus are subject to the articulable suspicion requirement of *Walde*. Because we believe this claim requires an inquiry into the nature of the privacy interest held by Grant Thornton's individual partners in the partnership's documents, *see Bellis v. United States*, 417 U.S. 85, 92–93, 94 S.Ct. 2179, 2185–86, 40 L.Ed.2d 678 (1974) (discussing factors relevant to existence of privacy interest in records of "organized, institutional activity") (internal quotations omitted), we also remand this claim for factual development before the District Court.

7. Because we find no statutory authority to support the San Jacinto subpoena, we need not address Grant Thornton's claim that the subpoena is overbroad.

### III. CONCLUSION

We hold that the RTC lacks statutory authority to subpoena financial and insurance information for the sole purpose of determining the cost-effectiveness of litigation once suit is filed against the subpoena recipient. Thus, we reverse the District Court's order enforcing the San Jacinto subpoena. With regard to the Cobb Federal subpoena, we find that Grant Thornton's claims that the subpoena violates its privilege and privacy rights require factual development. We therefore remand these claims for further proceedings before the District Court.

*So ordered.*