**In re: SEALED CASE.**

No. 98–3032.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1998.

Decided June 19, 1998.

Before: HENDERSON, ROGERS and TATEL, Circuit Judges.

TATEL, Circuit Judge:

Directed by a grand jury subpoena to produce notes and other written materials prepared in connection with work for a client, a lawyer claimed that the attorney work-product privilege protected the materials from disclosure. The district court, finding that a "specific claim" had not arisen at the time the lawyer prepared the documents, held the privilege inapplicable. Because the workproduct privilege in this case turns not on whether a specific claim existed, but instead on whether, under all the circumstances, the lawyer prepared the materials "in anticipation of litigation," we reverse and remand.

I

Shortly after the Chairman of the Republican National Committee founded a non-profit think tank called the National Policy Forum, the RNC loaned the newly formed organization over $2.5 million. From the beginning, critics closely scrutinized the relationship between the two organizations. A Washington Post editorial argued that the NPF should "be subject to the usual laws on contributions and disclosures." *Who Paid for Those Ideas?*, WASH. POST, Oct. 1, 1993, at A24. According to the editorial, the watchdog group Common Cause was "looking into" whether the NPF " 'violat[ed] ... the campaign laws and whether it should be chal-

lenged.'" *Id.* (quoting Common Cause's president).

Acting through the Justice Department's Campaign Financing Task Force, the government alleges that in the summer of 1994, the RNC Chairman arranged to have funds transferred from a Hong Kong company through an American subsidiary to an American bank to serve as collateral for a loan the bank made to the NPF. From the proceeds of the loan, the NPF then paid the RNC $1.6 million. In connection with this transaction, the RNC consulted a lawyer who, according to the lawyer's affidavit, prepared, made notes on, and edited documents "in anticipation of possible litigation."

In August 1995, the Democratic National Committee filed a complaint with the Federal Election Commission alleging that the RNC's relationship with the NPF violated the Federal Election Campaign Act, 2 U.S.C. §§ 431–455 (1994). Although nothing in the record tells us what, if anything, the FEC did with this complaint, two years later a federal grand jury issued a subpoena directing the lawyer to produce memoranda, correspondence, notes, and other written materials relating to the 1994 loan transaction. Producing over 140 documents, some of which were redacted, the lawyer withheld ninety-five pages, claiming they were protected by either the attorney-client or the work-product privilege. After the government moved to compel, the RNC filed a motion to intervene, which the district court granted.

In a Memorandum Opinion and Order issued on March 10, 1998—and sealed to protect the lawyer's identity, *see In re Motions of Dow Jones & Co.*, 142 F.3d 496, 504, 505 (D.C.Cir. 1998) (noting that grand jury secrecy rules protect the identity of grand jury witnesses)—the district court ruled that the work-product privilege protected none of the documents prepared by the lawyer prior to the filing of the DNC's August 1995 complaint. The district court found that neither the lawyer nor the RNC had "articulate[d] any specific claim the RNC could have been facing at the time of the loan transaction" or "explain[ed] with any particularity how the loan transaction could have led to litigation."

*In re Grand Jury No. 95–3*, No. 98–003, at 7 (D.D.C. Mar. 10, 1998). For documents prepared after the filing of the DNC complaint, the court ruled that the privilege applied, but that since the government can obtain access to factual information contained in even protected documents by demonstrating substantial need and an inability to obtain the materials elsewhere, and finding that such a showing had been made here, the court would review the documents *in camera* to determine whether they contain only factual information, or instead represent opinions, judgments, and thought processes of counsel. *Id.* at 8.

■ . The RNC appealed, and we granted its motion to stay pending appeal. Although parties ordinarily may not immediately appeal discovery orders, but must instead disobey and then appeal a subsequent contempt order, *see In re Kessler*, 100 F.3d 1015, 1016 (D.C.Cir.1996), the RNC may proceed under the *Perlman* doctrine, which authorizes parties immediately to appeal discovery orders addressed to disinterested third parties, *see Perlman v. United States*, 247 U.S. 7, 13–15, 38 S.Ct. 417, 62 L.Ed. 950 (1918). The *Perlman* doctrine applies here because the lawyer swore in an affidavit an intention to produce the documents rather than submit to a contempt citation. *See In re Sealed Case*, 141 F.3d 337, 340 (D.C.Cir. 1998) ("In some cases the attorney will indicate an intention to comply with the subpoena, and on those facts this circuit regards *Perlman* as controlling."). Because the *Perlman* doctrine authorizes appeals only by clients, however, we dismissed the lawyer's appeal. *See id.* ("Of course that makes appeal available for the client, not, as here, the attorney.").

■ We generally review district court decisions enforcing document subpoenas only for arbitrariness or abuse of discretion. *See In re Sealed. Case*, 121 F.3d 729, 740 (D.C.Cir.1997). But because the RNC argues that the district court applied the wrong legal standard, our review here is *de novo. See In re Subpoena Served upon the Comptroller of the Currency*, 967 F.2d 630, 633 (D.C.Cir.1992) (court gives no deference if the ruling "rests upon a misapprehension of

the relevant legal standard or is unsupported by the record").

## II

■ The work-product privilege protects written materials lawyers prepare "in anticipation of litigation." FED.R.CIV.P. 26(b)(3). By ensuring that lawyers can prepare for litigation without fear that opponents may obtain their private notes, memoranda, correspondence, and other written materials, the privilege protects the adversary process. *See In .re Sealed Case,* 107 F.3d 46, 51 (D.C.Cir.1997) ("Like the attorney-client privilege, work product immunity promotes the rendering of effective legal services."). As the Supreme Court said in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the source of the work-product privilege:

> [I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

*Id.* at 510–11, 67 S.Ct. 385; *see also* 2 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE 410 (2d ed.1994) ("Protection is needed because an attorney preparing for trial must assemble much material that is outside the attorney-client privilege, such as witness statements, investigative reports, drafts of pleadings, and trial memoranda."). The interests articulated in *Hickman* are present in both criminal and civil cases. *See United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) ("Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital. The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.").

Without a strong work-product privilege, lawyers would keep their thoughts to themselves, avoid communicating with other lawyers, and hesitate to take notes. As *Hickman* put it:

> Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

329 U.S. at 511, 67 S.Ct. 385; *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 136 cmt. b (Proposed Final Draft No. 1, 1996) ("RESTATEMENT") ("The work-product doctrine also protects client interests in obtaining diligent assistance from lawyers. A lawyer whose work product would be open to the other side might forgo useful preparatory procedures, for example, note-taking.").

■ The "testing question" for the work-product privilege, we have held, is " 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.' " *Senate of Puerto Rico v. U.S. Dep't of Justice,* 823 F.2d 574, 586 n. 42 (D.C.Cir.1987) (quoting 8 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2024 at 198 (1970)). For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable. *See Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252, 1260 (3d Cir.1993) (noting that "anticipation of litigation" inquiry is both subjective and objective); RESTATEMENT § 136, cmt. i ("[T]he immunity covers only material produced with litigation as the primary object of attention and when the apprehension of litigation was reasonable in the circumstances.").

■ The question presented in this case is whether a "specific claim" must have arisen at the time the lawyer prepared the documents before a court can conclude that they were in fact prepared "because of the prospect of litigation." The RNC argues that the work-product privilege turns not on the presence or absence of a specific claim, but rather on whether, under "all of the relevant circumstances," the lawyer prepared the materials in anticipation of litigation. According to the government, the "'specific claim' analysis ... is essential to delimit the boundary" between privileged and nonprivileged materials.

At first glance, our cases on this issue appear inconsistent. We required a specific claim in two cases, *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 864–66 (D.C.Cir.1980), and *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1202–03 (D.C.Cir. 1991). We rejected the need for a specific claim in two other cases, *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C.Cir.1992), and *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 126–28 (D.C.Cir.1987). Properly read, however, these cases are not in conflict.

In the two cases requiring a specific claim—*Coastal States* and *SafeCard*—the documents at issue had been prepared by government lawyers in connection with active investigations of potential wrongdoing. The documents in *Coastal States* were legal advice memoranda prepared by government lawyers in response to specific requests from agency auditors examining oil company compliance with certain regulations. We employed a specific claim requirement to distinguish memoranda that could be protected by the work-product privilege because they advised DOE auditors how to proceed with specific investigations of suspected wrongdoers—*i.e.*, the lawyers prepared them "in anticipation of litigation"—from other documents that were "'neutral, objective analyses of agency regulations'" and therefore unprotected by the privilege. *Delaney*, 826 F.2d at 127 (quoting *Coastal States*, 617 F.2d at 863). *SafeCard* dealt with documents prepared by agency lawyers in connection with an active investigation into suspected illegal stock trading. We held there that when

government lawyers "prepare[ ] a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party," they have met the specific claim test. 926 F.2d at 1203.

*Delaney* and *Schiller* dealt with very different situations. In those cases, government lawyers acted not as prosecutors or investigators of suspected wrongdoers, but as legal advisors protecting their agency clients from the possibility of future litigation. Both cases rejected the specific claim requirement and instead focused on whether, under all of the circumstances, the lawyers prepared the materials "in anticipation of litigation." At issue in *Delaney* were memoranda prepared by agency attorneys that analyzed the legal ramifications of a new system of statistical sampling for auditing large accounts. Observing that the memoranda "advise the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome," we characterized *Coastal States*' "specific claim" language as an "observation," concluded that *Coastal States* "did not intend to lay down [a] blanket rule," and held that the work-product privilege protected the documents even though no specific claim had yet arisen. 826 F.2d at 127. *Schiller* concerned lawyer-prepared documents containing tips and advice for litigating cases under the Equal Access to Justice Act. Responding to an argument that "the work-product doctrine requires that the documents be created in anticipation of litigation over a specific claim," we said, "we have already rejected that argument." 964 F.2d at 1208. *Schiller* protected the documents even though no specific claim had arisen.

We need not decide whether the *Coastal States/SafeCard* specific claim test has any continued vitality where government lawyers act as prosecutors or investigators of suspected wrongdoers. Here, as in *Delaney* and *Schiller*, the lawyer acted not as prosecutor or investigator, but rendered legal advice in order to protect the client from future litigation about a particular transaction, even though at the time, neither the FEC nor the DNC had made any specific claim. In addition to asserting more than once that the

documents were prepared "in anticipation of litigation," the lawyer's uncontested affidavit states that by the summer of 1994, "I was aware that the Federal Election Commission ('FEC') had the authority to conduct investigations and initiate civil actions ... concerning possible violations of the Federal Election Campaign Act" and that "I was also aware that the chairman of the FEC had announced that the FEC was investigating cases involving allegations of illegal contributions in U.S. elections." Most important, the affidavit says that "I was further aware that the NPF had been criticized in the press as an organization used by the RNC to evade federal campaign finance laws, and thus I had a significant concern that litigation over this issue was probable." Another RNC lawyer said, also in an uncontested affidavit, that "[F]rom the time the NPF was formed, I and the RNC were concerned about the substantial likelihood of potential litigation initiated either by the DNC or other entities. Therefore, the RNC consulted with [the lawyer] to receive advice, counsel, and services in anticipation of such litigation."

Assuming that these affidavits accurately describe the lawyer's materials at issue in this case, denying work-product protection to the materials would be no more appropriate than denying protection to the documents at issue in *Delaney* and *Schiller*. To be sure, the lawyers' affidavits could have been more specific, *e.g.*, they could have stated that the lawyers believed that the FEC would bring a FECA action based on the loan transaction or cited particular provisions of the code. But we think the affidavits sufficiently establish that, as in *Delaney* and *Schiller*, the client asked the lawyer to review a matter that the client feared could lead to litigation, and that the lawyer, knowing critics were scrutinizing the RNC–NPF relationship, prepared documents in anticipation of litigation over exactly that relationship. In view of the intense focus in this city on claims of campaign finance law violations, as well as the public criticism of the RNC–NPF relationship, the lawyer's concern that the payment from one organization to the other from proceeds of a loan backed by a transfer of funds from a Hong Kong company might lead to litigation seems as objectively reasonable to us as the concerns of the government lawyers in *Delaney* and *Schiller*.

Not only do *Delaney* and *Schiller*, not *Coastal States* and *SafeCard*, control this case, but a contrary ruling would undermine lawyer effectiveness at a particularly critical stage of a legal representation. It is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur. For instance, lawyers routinely meet with potential grand jury targets to discuss possible charges, consider whether business decisions might result in antitrust or securities lawsuits, analyze copyright and patent implications of new technologies or works of art, and assess the possibility that new products might give rise to tort actions. If lawyers had to wait for specific claims to arise before their writings could enjoy work-product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively. A lawyer advising a potential grand jury target, for example, might be reluctant to write something like "the critical facts which could harm my client are ..." even though it would help the lawyer organize complex thoughts, because in the government's hands, such a note could become a powerful weapon against the client. Likewise, asked by a client to evaluate the antitrust implications of a proposed merger and advised that no specific claim had yet surfaced, a lawyer knowing that work product is unprotected would not likely risk preparing an internal legal memorandum assessing the merger's weaknesses, jotting down on a yellow legal pad possible areas of vulnerability, or sending a note to a partner—"After reviewing the proposed merger, I think it's O.K., although I'm a little worried about ... What are your views?" Nor would the partner respond in writing, "I disagree. This merger is vulnerable because ..." Discouraging lawyers from engaging in the writing, note-taking, and communications so critical to effective legal thinking would, in *Hickman*'s words, "demoraliz[e]" the legal profession, and "the inter-

ests of the clients and the cause of justice would be poorly served." 329 U.S. at 511.

The government relies on *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC,* 5 F.3d 1508 (D.C.Cir.1993), our most recent case bearing on this issue, but nothing in that decision requires a specific claim before lawyers preparing for the possibility of litigation can claim work-product protection. Although *Linde Thomson* quotes the "specific claim" language from *Linde Thomson, id.* at 1515, we did not apply the "specific claim" standard to reject protection for any requested document. Instead, *Linde Thomson* held that communications between insurer and insured do not "warrant an extension of the federal work-product doctrine beyond its current confines," *id.* at 1516, and that the district court had acted appropriately by allowing the appellant to establish a privilege log for documents arguably protected by the privilege, *id.*

▪ Of course, not all work undertaken by lawyers finds protection in the work-product privilege. In some cases, the absence of a specific claim will suggest that the lawyer had not prepared the materials "in anticipation of litigation." And as *Linde Thomson* explained, the privilege has no applicability to documents prepared by lawyers "in the ordinary course of business or for other nonlitigation purposes." *Id.* at 1515. We hold only that where, as here, lawyers claim they advised clients regarding the risks of potential litigation, the absence of a specific claim represents just one factor that courts should consider in determining whether the work-product privilege applies.

We would expect the government to support this result. For one thing, requiring a specific claim would subject to discovery a great deal of pre-claim work by agency lawyers that the work-product privilege now protects. If the government's position were to prevail in this case, materials similar to the documents at issue in *Delaney* and *Schiller* would no longer enjoy work-product protection. Moreover, lacking resources to pursue every suspected violation of federal law, the government must depend on effective, conscientious private lawyers to help clients comply voluntarily. The government might

gain some short-term benefit by obtaining the documents in this case, but the long-range consequences could be quite damaging. Weakening the ability of lawyers to represent clients at the pre-claim stage of anticipated litigation would inevitably reduce voluntary compliance with the law, produce more litigation, and increase the workload of government law-enforcement agencies.

## III

This brings us to the district court's decision and its reasons for finding that the pre-August 1995 documents are unprotected by the work-product privilege. According to the government, the district court employed the "specific claim" test as only one factor in its analysis. We disagree. Although *Delaney* and *Schiller* clearly control this case, the district court, relying primarily on *Coastal States,* treated the absence of a specific claim as dispositive.

The district court's memorandum begins by properly noting several times that the privilege protects materials prepared "in anticipation of litigation." *In re Grand Jury No. 95–3,* No. 98–003, at 6. Quoting *Coastal States,* the memorandum goes on to say that to meet this standard " 'the documents must at least have been prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind,' " *id.* (quoting *SafeCard,* 926 F.2d at 1202 (quoting *Coastal States,* 617 F.2d at 865)), and that "[t]here must be 'at the very least some articulable claim, likely to lead to litigation,' " *id.* (quoting *Coastal States,* 617 F.2d at 865). The district court then directly applied this standard to the facts, concluding that the lawyer's "and the RNC's assertions regarding potential litigation are too vague to support application of the work product doctrine before August 1995." *Id.* at 7. Recognizing that according to the affidavit, the lawyer knew that the FEC investigated allegations of illegal contributions and that the NPF had been criticized in the press as an organization used by the RNC to evade federal campaign finance laws, the court nevertheless found that the work-product privilege did not apply, saying only this:

Despite these averments, [the lawyer] and the RNC have not presented any concrete facts to the Court "which would likely lead to litigation" prior to August of 1995. They do not articulate any specific claim the RNC could have been facing at the time of the loan transaction nor do they explain with any particularity how the loan transaction could have led to litigation.

*Id.* As these two sentences demonstrate, the district court based its decision on three findings: that the lawyer (1) failed to present "concrete facts" "which would likely lead to litigation"; (2) failed to articulate a "specific claim"; and (3) failed to explain with any particularity how the transaction could have led to litigation. Although only the second of these findings mentions the phrase "specific claim," the first comes directly from the "specific claim" sentence in *Coastal States* that the district court quoted in its paragraph setting out the legal standard. *See Coastal States*, 617 F.2d at 865 ("[T]he documents must at least have been prepared with a *specific claim* supported by *concrete facts which would likely lead to litigation.*") (emphasis added). And the third finding, while substituting the word "particularity" for the word "concrete," the words "loan transaction" for the word "facts," and the phrase "could have led to litigation" for "would likely lead to litigation," merely restates the first finding and therefore is also directly traceable to the "specific claim" standard. When read in light of the legal standard articulated by the district court only two paragraphs earlier, this language indicates to us that the court rejected work-product protection because no "specific claim" had yet arisen. We think this interpretation finds further support in the district court's extension of the privilege to all post-complaint documents, thus suggesting that the district court focused on the filing of the complaint, not on whether the lawyer prepared the documents in anticipation of litigation, as the critical difference between protected and unprotected materials.

■ At oral argument, the government suggested that because nothing in the August 1995 complaint related directly to the loan transaction, the privilege should not protect the pre-complaint documents. Taking the government's characterization of the complaint as true—the record does not contain the complaint—we think this casts even further doubt on the district court's decision. If the complaint is unconnected to the transaction, why did the district court conclude that the post-August 1995 documents were protected by the privilege? In any event, the contents of the August 1995 complaint have little if any relevance to the issue before us. The work-product privilege protects documents prepared in anticipation of litigation regardless of whether the anticipated litigation ever occurs. RESTATEMENT § 136 cmt. i ("The fact that litigation did not actually ensue does not affect the immunity.").

## IV

Acknowledging the lack of clarity in our own decisions, but finding that the district court applied the wrong legal standard, we reverse and remand for the court to review the documents· *in camera* to determine whether, under all the circumstances, the lawyer prepared them "in anticipation of litigation," or whether they were prepared in the ordinary course of business (*e.g.*, to deal with issues such as interest rates, payment schedules, or collateral). *See In re Sealed Case*, 29 F.3d 715, 718 (D.C.Cir.1994) (remanding case to district court for application of the "because of the prospect of litigation" test). With respect to documents the court finds to have been prepared "in anticipation of litigation," the court should examine them (as it announced it will with respect to the post-August 1995 documents) to determine whether they contain purely factual materials, or instead represent the opinions, judgments, and thought processes of counsel.

*So ordered.*