**GUARDSMARK, INC.; Guardsmark, Inc., Medical Plan; and Board of Trustees of the Guardsmark, Inc., Medical Plan Trust Fund, Plaintiffs,**

v.

**BLUE CROSS AND BLUE SHIELD OF TENNESSEE, Defendant.**

**No. 01–2117–D/A.**

United States District Court, W.D. Tennessee, Western Division.

Feb. 21, 2002.

---

14. *Ecclesiastes* 3:1.

Jef Feibelman, W.J. Michael Cody, Douglas F. Halijan, Burch Porter & Johnson, Memphis, TN, Alan E. Schabes, Pete C. Elliott, Jeffrey D. Zimon, Mariann E. Butch, Anna K. Raske, Benesch Friedlander Coplan & Aronoff, Cleveland, OH, for plaintiffs.

John I. Houseal, Jr., Larry Montgomery, Jeffery A. Jarratt, Glankler Brown, PLLC, Memphis, TN, for defendant.

James Allen, U.S. Magistrate Judge, Memphis, TN, pro se.

## ORDER GRANTING DEFENDANT'S MOTION TO COMPEL PLAINTIFFS TO PRODUCE AUDIT FINDINGS, REPORTS, AND RELATED AUDIT INFORMATION

ALLEN, United States Magistrate Judge.

Before the court is the motion by defendant herein for an order compelling plaintiffs to produce audit findings, reports and related audit information prepared by Watson Wyatt & Company, Brown & Nelson, Insurance Claims Auditing and Professional Services, Plaintiffs and any other persons who have audited Blue Cross' administration of Plaintiffs' health plan. For the reasons hereinafter set forth, defendant's motion is GRANTED.

### *Placing This Dispute in Context*

Plaintiff Guardsmark, Inc. ("Guardsmark") is a large national corporation, apparently with its headquarters in Memphis, Tennessee, and has at least 6,800 employees (Complaint, p. 10). On or about February 12, 1996, Guardsmark (desiring to provide group medical insurance for its employees, and seeking to comply with the provisions of 29 U.S.C. §§ 1001, *et seq.*, known as "ERISA"[1] ), entered into an "Agreement to Provide Certain Administrative Services Only" ("Agreement") with Memphis Hospital Service and Surgical Association, Inc. Briefly, the agreement would establish a group medical insurance plan for Guardsmark's employees, which plan Memphis Hospital Service and Surgical Association, Inc. would, for a fee, administer. Guardsmark would be responsible for the payment of the medical bills of such employee members (Agreement, Exh. A to Complaint). Memphis Hospital Service and Surgical Association, Inc. would actually pay the claims, and then submit monthly reports thereof, providing the basis by which it would be reimbursed by Guardsmark, and by which it would receive payment for its services. Ultimately defendant Blue Cross and Blue Shield of Tennessee assumed all of the rights, duties, obligations, and liabilities of Memphis Hospital Service and Surgical Association, Inc., as it relates to the agreement with Guardsmark. Defendant will hereafter be referred to as "Administrator".

According to Guardsmark, it "experienced significant problems with (the Administrator's) administration of the (Agreement), which became more evident as problems arose in 1998 and 1999" (Complaint, p. 7). These problems, or "deficiencies" resulted in Guardsmark's termination of the Agreement, effective on October 31, 1999 (Complaint, p. 7). There was, pursuant to the terms of the Agreement, a "run-out" period, lasting through January 31, 2000, during which the Administrator was to "provide the continuation of claims administration ... for claims incurred prior to the cancellation date for a period of three months, and any claims administrative services associated with continuation of group health care benefits" (Agreement, Section 9).

According to the Agreement, the Administrator was obligated to, among other things:

"P. Upon reasonable notice, permit and cooperate with, (sic) the Employer to accomplish such audits (by third-party or in-house) of Administrator's records (reasonable sample size) related to the reports provided pursuant to this Agreement, Administrator's claims processing, discounts, credits/administrative fees, provider charges, covered charges, amounts paid, amount of service, non-covered amounts, savings, (sic)group net pay and discounts retained by Administrator, as Employer may reasonably require to discharge its duties, (sic) under ERISA, (sic) monitor Administrator's performance hereunder, and (sic) respond to Employee and/or government inquiry."

(Agreement, Sec. 2P).

According to the Complaint, there were numerous letters and conferences between Guardsmark and the Administrator (before and after the termination of the Agreement) regarding these "problems" or "deficiencies". One such meeting apparently occurred sometime prior to August 16, 1999 (Ex. D and E to Complaint).

As previously indicated, Guardsmark, on October 31, 1999, terminated its Agreement

---

1. The Employment Retirement Income Security Act of 1974.

with defendant Administrator, but defendant Administrator was required, by the Agreement, to continue handling claims administration for the "run-out" period through January 31, 2000.

At some time prior to April 13, 2000, Guardsmark (through Milton J. Schachter, Assistant Vice President and Manager of Health Benefits Design)[2] contacted Watson, Wyatt and Company ("Watson Wyatt"), an auditing firm with significant experience with medical claims audits (Affidavit of Laura Sy, Exh. B). On April 13, 2000, Ted Nussbaum (of Watson Wyatt)[3] wrote a letter to Schachter, setting forth his company's standard claims audit process, and alternative approaches to auditing the three years in question (prior to November 1, 1999)(Exh. B). Fees are quoted in this letter. Watson Wyatt's capabilities are set forth, as well as a list of prior customers, and the educational background of Watson Wyatt's management team. In short, this letter was a "sales pitch". The purpose of this audit, as indicated in the letter, was to examine the accuracy and appropriateness of defendant's claims payments, and (if errors were found) to confer with defendant in an effort to reach agreement (as to each error) "on the scene", so to speak. It should be noted that the format of this proposed audit fits closely with the requirements of Section 2P of the Agreement. It should be further noted that nowhere in the Nussbaum letter is there any mention of any expressed need by Guardsmark to prepare for pending litigation, or to determine whether litigation was appropriate[4].

On May 5, 2000, Gareth C. Leviton (General Counsel for Guardsmark) wrote Ms. Laura Sy (Regional Counsel for defendant Blue Cross–Blue Shield of Tennessee), indicating that Guardsmark had hired Watson Wyatt "to conduct an audit of claims processed and paid by Blue Cross Blue Shield of Tennessee

on behalf of Guardsmark, Inc. and the Guardsmark, Inc. Medical Plan Trust Fund during the calendar years 1997, 1998, and 1999." (Affidavit of Laura Sy, Ex. C). He indicated that Watson Wyatt would require "access to the paid claim files for their audit", and requested that defendant provide Watson Wyatt with a computer tape (containing exhaustive information, listed in an attachment to the letter) of all claims paid in each of these three years. Leviton's letter stated that he "expect[ed] your organization will assist them by making any and all necessary information available to them on a timely basis ... [and] ... look[ed] forward to Blue Cross's complete cooperation with this matter".

The clear inference to be drawn from this letter is that Guardsmark was relying on Section 2P of the old Agreement, the language of which could reasonably be interpreted as requiring cooperation by defendant (even though the Agreement had, by that time, technically been terminated). This inference is a reasonable one, in light of the context of the relationship between plaintiffs and defendant (involving the winding up of the previous contractual relationship and the final "settling up" of accounts). This inference is supported by the tenor of the letter from Ms. Jane L. Lassner (of Watson Wyatt) to Ms. Sondra Rawls, at defendant's Memphis office, dated May 23, 2000, setting forth the details of the intended audit (Affidavit of Laura Sy, Exh. D). Such inference is more justifiably drawn than the inference that Guardsmark was asking defendant to cooperate in Guardsmark's efforts to determine whether it should sue defendant.

At some point in May or June of 2000, Guardsmark apparently hired the firm of Brown & Nelson to assist Watson Wyatt (apparently to review claims "from an aggregate perspective" to assess the possibility of fraud)[5] (Affidavit of Laura Sy, Exh. G). Al-

---

**2.** There is no indication that Schachter is an attorney.

**3.** There is no indication that Nussbaum is an attorney.

**4.** There is mention of the fact that Watson Wyatt has been called to testify as an expert witness in lawsuits concerning the results of claims audits,

but this is in the context of bragging on Watson Wyatt's "unsurpassed ... reputation in the field of claims audits" (Exh. B, p. 6).

**5.** Although it is not totally clear, a reasonable inference is that Brown & Nelson was to see whether any individual claimants fraudulently obtained payments from Blue Cross Blue Shield.

though it is not completely clear, it appears that Watson Wyatt hired Insurance Claims Auditing & Professional Services ("ICAPS") to assist them in their audit of defendant (Affidavit of Laura Sy, Exh. G.).

This audit apparently occurred during the weeks of June 19, 2000—June 26, 2000 (Affidavit of Laura Sy, Exh. D, Exh. G).

### The Disputed Discovery Requests

On or about May 25, 2001, defendant Blue Cross served upon Guardsmark its First Set of Requests for Production of Documents (21 in number), and Guardsmark responded on June 27, 2001. Guardsmark fully responded to Request Number 18, partially responded to some of the others, and objected to most, citing the attorney-client privilege and the "work-product" exemption. Blue Cross thereupon filed the within Motion to Compel.

In Blue Cross's Memorandum in Support of its Motion to Compel, it is stated as follows:

"Blue Cross' document request numbers 1, 2, 3 and 4 specifically seek the production of Guardsmark health plan audits and investigations, going so far as to mention Watson by name in Request Number 1 and Brown and [ICAPS] by the description of 'forensic consultants' in Request No. 4. Furthermore, the remainder of Blue Cross' documents requests, especially numbers 5 through 15 and 17 through 21, all very specifically seek the basis for Guardsmark's Complaint allegations, which in fact, (sic) are the Watson, Brown, [ICAPS] and Guardsmark audits."

Memorandum, p. 7.

Guardsmark has responded to Blue Cross's Motion to Compel by saying that the audit reports sought are immune from disclosure under the "work product" doctrine. Guardsmark does not assert that the audit reports are immune from disclosure because of the attorney-client privilege. Thus, the only issue herein is whether the so-called "work product" doctrine protects these audit reports from disclosure.

Blue Cross has further contended that, even if the "work product" doctrine applies, it has been waived.

### Applicable Legal Principles

A party to litigation is entitled to obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party . . ." Fed.R.Civ.P. 26(b)(1). The material sought to be discovered, to be "relevant", "need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1).

The foregoing liberal discovery rule is subject to the "trial preparation" exception [6], found in Fed.R.Civ.P. 26(b)(3), which reads, where pertinent, as follows:

"... [A] party may obtain discovery of documents and tangible things otherwise discoverable .... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation..."

The Sixth Circuit, in *Toledo Edison Co. v. G A Technologies, Inc.*, 847 F.2d 335, 339 (6th Cir.1988), has set forth a five step analysis that must be used in judging a "work product" exemption claim. The steps are as follows:

1. The party requesting discovery must show that the materials are "relevant" to the subject matter of the litigation;

---

**6.** The above outlined discussion does not deal with the discovery of *expert opinions*. See Rule 26(b)(4).

2. If this burden is met, the objecting party has the burden of showing that the material was "prepared in anticipation of litigation or for trial";

3. If this burden is met, the requesting party must show that he (a) has substantial need of the materials, and (b) that he is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means;

4. Even if the requesting party makes the showing required in step 3, the court may not require discovery of "mental impressions, conclusions, opinions or legal theories of an attorney or representative"; and

5. In any event, the court may not order discovery of Rule 26(b)(4) expert materials, without also satisfying Rule 26(b)(4).

In the instant case, Guardsmark has not seriously contended that Blue Cross has failed to. establish that the materials sought are "relevant" to the litigation. Therefore, the central issue is whether Blue Cross has shown that the materials sought were "prepared in anticipation of litigation or for trial." If not, the court's task is at an end, and the materials must be produced.

The court in *Toledo Edison*, 847 F.2d at 339, stated that this showing "can be made (and opposed) by any of the traditional ways in which proof is produced in pretrial proceedings."

The burden of proof is on the party asserting the "work product" doctrine to establish that the writings or documents were prepared in anticipation of litigation. *Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 335 (4th Cir.1992). And the "work product" doctrine does not protect facts concerning the creation of work ·product or facts contained within the work product. *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir.1995).

Courts have had difficulty in verbalizing a test to determine whether writings or documents were "prepared in anticipation of litigation or for trial." It does seem that there are two categories of writings or documents covered by this language. The first would be documents or writings "prepared in anticipa-

tion of litigation". The second would be documents or writings "prepared for trial". Obviously the documents or writings which are the subject of Blue Cross's motion to compel were not "prepared for trial". Therefore, the question is whether the documents or writings were "prepared in anticipation of litigation".

In *Binks Manufacturing Co. v. National Presto Industries, Inc.*, 709 F.2d 1109 (7th Cir.1983), there was a contractual dispute between Binks, the manufacturer and seller of an "industrial spray finishing and baking system" to Presto. Binks sued Presto for the purchase price of the system, and Presto counterclaimed for damages resulting from defective design and manufacture of, and late delivery of, the system. Prior to litigation, there had been much negotiations between the parties regarding operational problems with the system. Binks had sent a letter to Presto, requesting full payment for the system's purchase price. As a result, Lavers (a Presto in-house attorney) went to a Presto plant to interview employees about the system's problems and to examine the equipment. He later sent back memos and letters to Presto's chief in-house counsel regarding these problems. In one, he set forth a recommended strategy to be used in negotiations with Binks concerning these problems. As a result of these memos and/or letters, Presto wrote Binks, indicating all of the problems seen, and advising that, unless the problems were taken care of, Presto would send its own experts to correct the problems, and withhold payments to "set off against our damages". Two of the letters or memos by Lavers were ordered produced by the lower court, over the "work-product" objection of Binks.

The Seventh Circuit, in upholding the lower court's ruling requiring production of these documents, stressed that in neither letter (by Binks or by Presto) were there any threats of, or expression of intent to institute, litigation. *Binks*, 709 F.2d. at pp. 1119–20. The court, while indicating that there might have been "the remote prospect of litigation" when Lavers prepared his memoranda, concluded nevertheless that Presto had failed to meet its burden of proving that the memo-

randa were "prepared ... *because* of the prospect of litigation ..." or that "... some articulable claim, *likely* to lead to litigation" had arisen. *Binks*, 709 F.2d. at p. 1120 (citations, and emphases, in original).

In *National Union Fire Insurance Company v. Murray Sheet Metal Co.*, 967 F.2d 980 (4th Cir.1992), a fire occurred at a General Electric Company plastics plant, which was, at the time, being renovated by Murray Sheet Metal Company. There was small fire damage, but extensive damage caused by chemical contamination. Arkwright Mutual Insurance Company (General Electric's insurance company) paid the losses, and sued National Union Fire Insurance Company (whose insured is not made clear in the opinion, but was not Murray), which had resisted payment, believing that the chemical contamination was not caused by the fire. Promptly after the fire, Murray began an investigation of the circumstances of the fire and the chemical contamination, gathering data concerning the use of the chemicals at the plant, and the source and extent of contamination, conducting medical tests of its employees and their clothing, and obtaining statements from other Murray employees. This investigation was initially done by the safety director for Murray, but Murray's insurance company was notified. It hired an independent adjusting company, which conducted a further investigation.

National Union sought production of discovery of Murray's investigative materials [7], which was resisted on grounds of "work-product". The Fourth Circuit reversed the lower court's ruling, stating that there had been an insufficient showing at the trial court level to make an appropriate decision, and directing that further findings be made. *National Union*, 967 F.2d. at 985. In so ruling, however, the court indicated that "materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation ..." *National Union*, 967 F.2d. at 984. The court said that "[d]etermining the driving

force behind the preparation of each requested document is therefore required in resolving a work product immunity question". *Id.* The test to be used, the court concluded, was that "[t]he document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Id.*

In *United States v. Adlman*, 134 F.3d 1194 (2nd Cir.1998), Sequa Corporation had two wholly owned subsidiaries, and contemplated merging them. Such a merger was expected to produce an enormous loss on paper, and thus making possible a very large tax refund, which Adlman (the Vice President for Taxes and attorney for Sequa) expected would be challenged by the IRS and would result in litigation. Adlman consequently asked Sheahen (an accountant and lawyer at Arthur Andersen & Co.) to evaluate the tax implications of the proposed restructuring. He did so and submitted a preliminary, and subsequently a final, 58 page memorandum, providing a detailed legal analysis of likely IRS challenges to the reorganization and resulting tax refund claim. This memorandum proposed possible legal theories or strategies for Sequa to adopt in response, and made predictions about the likely outcome of the litigation.

Sequa went ahead with the restructuring, claimed a loss, and was audited by the IRS. The IRS requested a number of documents; Sequa acknowledged the above Memorandum; cited work-product in refusing to produce it; and the IRS thereafter issued a summons for its production. When Sequa declined to comply, the IRS brought an action to enforce the subpoena.

The Second Circuit, in remanding the cause to the lower court for further action, indicated that further findings were necessary to determine whether the Memorandum "would have been prepared irrespective of the anticipated litigation and therefore was not prepared because of it." *Adlman*, 134 F.3d at 1205.

---

**7.** Not the file of the independent insurance adjuster, which was the subject of different litigation.

In reaching this conclusion, the court surveyed the authorities, and rejected the view of the Fifth Circuit, set forth, *inter alia,* in *United States v. El Paso Co.,* 682 F.2d 530 (5th Cir.1982), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984), that documents, in order to be protected from disclosure under the "work product" doctrine, must have been prepared "primarily or exclusively to assist in litigation". *Adlman,* at 1198. Instead, the court in *Adlman* accepted the view set forth in Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994), and authorities therein cited, that documents should be determined to have been prepared "in anticipation of litigation" if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *Adlman,* 134 F.3d at 1202 (emphasis by court).

In the case of *In re Sealed Case,* 146 F.3d 881 (D.C.Cir.1998), the District of Columbia Circuit was called upon to examine the "work product" doctrine. The Democratic National Committee, in August of 1995, filed a complaint with the Federal Election Commission, contending that the Republican National Committee's actions in assisting a newly created non-profit "think tank" called the National Policy Forum violated the Federal Election Campaign Act. The specific complaint was that the RNC Chairman, in the summer of 1994, arranged to have funds transferred from a Hong Kong company through an American subsidiary to an American bank to serve as collateral for a loan the bank made to the NPF, the proceeds of which the NPF then used to repay part of a loan earlier made to it by the RNC. In connection with this transaction, the RNC consulted a lawyer who prepared, made notes on, and edited documents. As a result thereof, the lawyer apparently provided a report to the RNC

Previously, in October of 1993, an article appeared in the Washington Post regarding this, indicating that the "watchdog group" Common Cause was looking into the question of whether the NPF violated the campaign laws and whether it should be challenged (this, regarding the loan made to it by the RNC).

Nothing was apparently done on the FEC complaint and, approximately two years later, a federal grand jury issued a subpoena directing the lawyer consulted by the RNC to produce "memoranda, correspondence, notes, and other written materials relating to the 1994 loan transaction". The lawyer (and, later, the intervening RNC) resisted, claiming "work product" immunity from disclosure.

The trial court, concluding that neither the lawyer nor the RNC had articulated "any specific claim the RNC could have been facing at the time of the loan transaction" or "explain[ed] with any particularity how the loan transaction could have led to litigation", denied the privilege, and ordered production.

On appeal, the District of Columbia Circuit reversed and remanded, instructing the lower court to review the documents to determine whether, "under all the circumstances, the lawyer prepared them 'in anticipation of litigation', or whether they were prepared in the ordinary course of business." *Sealed Case,* 146 F.3d at 888.

The court indicated that, while in some cases, the absence of a specific claim would suggest that the lawyer had not prepared the materials "in anticipation of litigation", this was not *per se* dispositive, but represented just one factor that courts should consider. *Sealed Case,* 146 F.3d at 887.

█ In reaching this conclusion, the court indicated that the "testing question" for the "work-product" exemption was " 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation' ", and that, "[f]or a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *Sealed Case,* 146 F.3d at 884 (internal citations omitted); *see also Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.,* 145 F.R.D. 84, at 87 (N.D.Ill.1992).

While I have found no Sixth Circuit authority on the foregoing propositions, the

more reasoned approach (and therefore the approach that the Sixth Circuit would most likely take) is the one stated above in *Sealed Case,* 146 F.3d at 884, and this approach will be applied in this case [8]

The only basis for Guardsmark's claim that the documents in question were prepared "in anticipation of litigation" is the affidavit of Gareth C. Leviton, General Counsel for Guardsmark.

From the start, it is more important to note what Leviton's affidavit does *not* say, than it is to examine what it *does* say.

Leviton makes the conclusory [9] statement that Guardsmark, in conducting this investigation, "wanted to determine whether these errors (those found by the above-mentioned audits) resulted in damages to Guardsmark ... and, therefore, were cause for legal action" against Blue Cross (Leviton Aff. p. 2). There is no proof of this, other than Leviton's *post-hoc* analysis of Guardsmark's "intention".

Leviton states in his affidavit that, as Guardsmark's General Counsel, he "supervised all legal aspects of Guardsmark's investigation of BCBST". What he does *not* say is when he began such supervision; whether *he* requested the audit by Watson Wyatt; Brown and Nelson, and/or ICAPS; or whether *he* requested, and supervised, any investigation or audit by Guardsmark. He merely states that, based on the information obtained by these audits and investigations, he decided to recommend legal action against Blue Cross.

■ In any event, the fact that general counsel may be involved in oversight does not make it self-evident that the documents prepared were prepared in anticipation of litigation. *Sandberg v. Virginia Bankshares, Inc.,* 979 F.2d 332, 356 (4th Cir.1992).

■ Under all of the circumstances herein, it is more reasonable to conclude that the audit made (and the report prepared thereon) by Watson Wyatt was prepared pursuant to the original Agreement, in the process of winding up all the details of the relationship between plaintiffs and defendants and a "striking of a balance". Of course, after such an investigation is made, the facts (and opinions) are "on the table", so to speak, and counsel, in reviewing them, would be obliged to consider a number of options based thereon, including litigation. But preparation "in anticipation of litigation" connotes action taken *beforehand,* not afterwards.

Thus, the nature of these documents, and the factual situation in this dispute, do not justify the conclusion that the documents involved can fairly be said to have been prepared because of the prospect of litigation. There has been no showing that a lawyer, or any representative of Guardsmark, had a subjective belief that litigation was a real possibility, and, even if someone had such a subjective belief, it would not, under the circumstances, have been objectively reasonable. *In re Sealed Case,* 146 F.3d 881, 884 (D.C.Cir.1998).

Accordingly, plaintiff Guardsmark is DIRECTED to produce for inspection and copying, within TWENTY–FIVE (25) DAYS of the docketing of this order, any reports, audits, investigatory activity, etc., made by Watson Wyatt; Brown and Nelson; ICAPS; and Guardsmark, as well as all supporting data, relating to its contractual relationship with Blue Cross during the years in question.

IT IS SO ORDERED.

---

8. Blue Cross has also argued that, even if the documents sought were prepared "in anticipation of litigation", Guardsmark waived this discovery exemption by "disclosing" them in its letter of December 22, 2000, in which it made a formal demand upon Blue Cross of $8,380,076.00. In light of the decision made herein that Guardsmark has failed to establish that the documents involved herein were prepared "in anticipation of litigation", there is no need to decide this claim. If it were necessary, the claim of waiver is without merit, and verges

on the frivolous. The fact that a party uses its investigation as a basis for making a claim, and for drafting a complaint, does not mean that the investigation becomes discoverable.

9. In order for an affidavit to be acceptable supporting, or opposing, a Rule 56 motion, it must set forth "such facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). There is no reason to believe that this principle would not apply in this context.