UNITED STATES of America
EX REL. Harry BARKO,
Plaintiff–Relator,

v.

HALLIBURTON COMPANY,
et al., Defendants.

CASE NO. 1:05–CV–1276

United States District Court,
District of Columbia.

Signed March 6, 2014

Anthony C. Munter, Price Benowitz, LLP, David K. Colapinto, Michael David Kohn, Stephen M. Kohn, Kohn, Kohn & Colapinto, LLP, Washington, DC, for Plaintiff–Relator.

John Martin Faust, Law Offices of John M. Faust, PLLC, Craig D. Margolis, Alden Lewis Atkins, Tirzah S. Lollar, Vinson & Elkins, L.L.P., John Randall Warden, U.S. Department of Justice, Washington, DC, Daniel H. Bromberg, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Redwood Shores, CA, Christine H. Chung, Quinn Emanuel Urquhart & Sullivan LLP, San Francisco, CA, Christopher Tayback, Scott L. Watson, Quinn Emanuel Urquhart & Sullivan LLP, Los Angeles, CA, for Defendants.

## OPINION & ORDER

Resolving Docs. [135, 139, 143, 144, and 145]

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE

In this *qui tam* case, Plaintiff–Relator Harry Barko moves for an order compelling Defendants Kellogg Brown & Root Services, Inc., KBR Technical Services, Inc., Kellogg, Brown & Root Engineering Corporation, Kellogg, Brown & Root International, Inc., and Halliburton Company (collectively "KBR Defendants") to produce certain documents relating to KBR's Code of Business Conduct ("COBC") in-

vestigations.[1] The KBR Defendants oppose the motion.[2] The motion is ripe.

## I. Background

### A. Discovery Requests

On November 14, 2013, Plaintiff–Relator Barko served his First Request for Production of Documents to the KBR Defendants requesting documents relating to internal audits and investigations of the subject matter of the First Amended Complaint.[3] Plaintiff–Relator Barko's further discovery requests asked for more information regarding KBR's investigations into the alleged misconduct.[4]

On December 23 and 24, 2013, the KBR Defendants filed their written responses to Plaintiff–Relator's discovery requests [5] and later confirmed documents responsive to Plaintiff–Relator's requests were being withheld. Defendants based their non-production on attorney-client privilege and on the attorney work-product doctrine.[6]

On January 16, 2014, the parties concluded their meet and confer obligations.[7] KBR then produced information regarding seven reports made pursuant to COBC investigations.[8]

On February 3, 2014, Plaintiff–Relator Barko filed his motion to compel the production documents relating to KBR's COBC investigations.[9] After opposition was filed, this Court ordered KBR to produce the claimed privilege documents for *in camera* review.[10]

The Court has reviewed KBR's COBC Reports and they are eye-openers. KBR's investigator found Daoud: "received preferential treatment." The reports include both direct and circumstantial evidence that Daoud paid off KBR employees and KBR employees steered business to Daoud. And the KBR investigation "reported a trend that D & P would routinely submit bids after proposals from other companies had been received." The reports suggest some KBR employee or employees fed information about competitor bids to Daoud to allow Daoud to submit a late bid undercutting the competitors.

More expensive to the United States, the reports say Daoud continually received contracts despite terrible completion performance and despite regular attempts to double bill. In one case, KBR gave Daoud a contract despite Daoud's bid being twice another bid from a competent contractor. KBR gave Daoud the job, supposedly because Daoud could quickly complete the work. Then Daoud failed to to complete the job on time KBR still paid the contract price.

In most cases, KBR completed Daoud's incomplete and late work and then approved paying Daoud's full bill. A quality assurance employee described: "D & P does very sub-standard work and have to be stood over every minute and watched. In most cases, KBR has had to step in and finish the work as outlined in the contract. D & P continues to provide sub-standard work and sub-standard goods to the Company."

1. Doc. 135.

2. Doc. 139.

3. Doc. 135–4, Exhibits 1 and 2.

4. *Id.* Exhibit 2.

5. *Id.* Exhibits 1 and 2.

6. *Id.* Exhibit 3.

7. *Id.* Exhibit 3–4.

8. *Id.* Exhibit 5.

9. Doc. 135.

10. Doc. 148

The reports also describe contracts where Daoud was the low bidder but KBR supervisors, including Gerlach allowed unbid change orders that ballooned the cost. With change orders, a rental of water trucks mushroomed from $45,000 to $195,000 even though Daoud's contract performance was bad.

### B. Summary Code of Business Conduct Procedure

COBC investigations typically begin when KBR receives a report of a potential COBC violation from an employee who either contacts the Law Department directly or sends a tip to a dedicated P.O. Box, email address, or a third-party operated hotline.[11]

Once received, these "tips" regarding potential misconduct are routed to the Director of the Code of Business Conduct ("Director").[12] The Director then decides whether to open a COBC File to investigate the matter.[13] Subsequent investigation documentation is then made part of the COBC File by the Director.[14]

As part of the investigation, COBC investigators interview personnel with potential knowledge of the allegations, review relevant documents, and obtain witness statements.[15] Once the investigation is complete, COBC investigators write a COBC Report.[16] The COBC Report is then transmitted to the Law Department.[17]

### II. Legal Standard

Rule 26 of the Federal Rules of Civil Procedure limits the scope of discovery to "any non-privileged matter that is relevant to any party's claim or defense" and "any matter relevant to the subject matter involved in the action."[18] Parties may petition the court for an order compelling disclosure or discovery.[19] The rule also provides for sanctions against parties that do not cooperate with discovery.[20]

### III. Analysis

The KBR Defendants say the COBC investigation materials are protected from disclosure by the attorney-client privilege or the work product doctrine.[21] The Court will address each in turn.

### A. Attorney–Client Privilege

 "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."[22] The privilege is designed to "encourage full and frank communication between attorneys and their clients."[23] However, like all privileges, the attorney client privilege is "not lightly created nor expansively construed, for [it is] in derogation of the search for truth."[24]

---

11. Doc. 139–1 at 3.

12. *Id.* at 4.

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. Fed.R.Civ.P. 26(b).

19. Fed.R.Civ.P. 37.

20. *Id.*

21. Doc. 139.

22. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

23. *Id.*

24. *United States v. ISS Marine Servs., Inc.*, 905 F.Supp.2d 121, 127 (D.D.C.2012) (quoting *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

In order to prevail on an assertion of the attorney-client privilege, the party invoking the privilege must show the communication is " 'for the purpose of securing *primarily* either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.' " [25] In order to determine the primary purpose, the "but for" formulation is used. The party invoking the privilege must show "the communication would not have been made 'but for' the fact that legal advice was sought." [26]

"Although 'complications in the application of the privilege arise when the client is a corporation,' " the Supreme Court held in *Upjohn Co. v. United States* that the privilege applies in the same manner "as long as '[t]he communications at issue were made by [company] employees to counsel for [the company] acting as such, at the direction of corporate superiors in order to secure legal advice from counsel.' " [27]

The Court finds that KBR fails to carry its burden to demonstrate that the attorney-client privilege applies to the COBC documents. Most importantly, the Court finds that the COBC investigations were undertaken pursuant to regulatory law and corporate policy rather than for the purpose of obtaining legal advice.

Department of Defense contracting regulations require contractors to have internal control systems such as KBR's COBC program to "[f]acilitate timely discovery and disclosure of improper conduct in connection with Government contracts." [28] These regulations further require a "written code of business ethics," "internal controls for compliance," "[a] mechanism, such as a hotline, by which employees may report suspected instances of improper conduct," "[i]nternal and/or external audits," "[d]isciplinary action for improper conduct," "[t]imely reporting to appropriate Government officials," and "[f]ull cooperation with any Government agencies." [29]

KBR's COBC policies merely implement these regulatory requirements.[30] The COBC investigation differs from the investigation conducted in *Upjohn*. The COBC investigation was a routine corporate, and apparently ongoing, compliance investigation required by regulatory law and corporate policy. In contrast, the Upjohn internal investigation was conducted only after attorneys from the legal department conferred with outside counsel on whether and how to conduct an internal investigation.[31] As such, the COBC investigative materials do not meet the "but for" test because the investigations would have been conducted regardless of whether legal advice were sought. The COBC investigations resulted from the Defendants need to comply with government regulations.

That employees who were interviewed were never informed that the purpose of the interview was to assist KBR in obtaining legal advice further supports that the purpose of the investigation was for busi-

25. *Id.* at 128 (internal citation omitted).

26. *Id.*

27. *ISS Marine,* 905 F.Supp.2d at 127–28 (quoting *Upjohn,* 449 U.S. at 389, 394, 101 S.Ct. 677).

28. Doc. 135–7 at 35, 48 C.F.R. § 203.7000–203.7001(a) (10–1–2001 edition).

29. *Id.*

30. Doc. 135–6.

31. *See Upjohn,* 449 U.S. at 386–87, 101 S.Ct. 677.

ness rather than legal advice.[32] The confidentiality agreement employees signed never mentions that the purpose of the investigation is to obtain legal advice.[33] Rather the confidentiality statement emphasizes the "sensitive" nature of the review and warns the employee of the possible adverse business impact unauthorized disclosure could have on KBR's work in the Middle East Region.[34] Moreover, "employees certainly would not have been able to infer the legal nature of the inquiry by virtue of the interviewer, who was a non-attorney." [35]

Therefore, because the COBC investigation was not for the primary purpose of seeking legal advice, it is not entitled to the protection of the attorney client privilege.

## B. Work–Product Doctrine

 KBR Defendants also say that the COBC investigation documents are protected from disclosure by the work-product doctrine. Work-product doctrine

protects an attorney's "mental impressions, conclusions, opinions, or legal theories" prepared in anticipation of litigation.[36] To determine whether a particular document was prepared in anticipation of litigation, this Circuit uses the "because of test" asking "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." [37] "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." [38] "[A] party bears a heavier burden when seeking work-product protection for a multi-purpose document because the D.C. Circuit has also recognized that 'the [work-product] privilege has no applicability to documents prepared by lawyers 'in the ordinary course of business or for other non-litigation purposes.' " [39]

 As the Court already discussed in the application of the attorney-client privi-

---

**32.** See ISS Marine, 905 F.Supp.2d at 130 (discussing the importance of what the employees are told is the purpose of the interview).

**33.** "Due to the sensitive nature of this review, I understand that the information discussed during this interview is confidential. I further understand that the information that I provide will be protected and remain within the confines of this review and only authorized personnel will have access to the information contained in this report.
I understand that in order to protect the integrity of this review, I am prohibited from discussing any particulars regarding this interview and the subject matter discussed during the interview, without the specific advance authorization of KBR General Counsel. I acknowledge and agree that I understand the unauthorized disclosure of this information could cause irreparable harm to the review and reflect adversely on KBR as a company and/or KBR performance in the Middle East Region and therefore, I understand that

the unauthorized disclosure of information may be grounds for disciplinary action up to and including termination of employment." Doc. 139–12.

**34.** Id.

**35.** ISS Marine, 905 F.Supp.2d at 131.

**36.** Fed.R.Civ.P. 26(b)(3)(B).

**37.** ISS Marine, 905 F.Supp.2d at 133–34 (quoting United States v. Deloitte, LLP, 610 F.3d 129, 137 (D.C.Cir.2010) (quoting In re Sealed Case, 146 F.3d 881, 884 (D.C.Cir. 1998))).

**38.** Id. (quoting In re Sealed Case, 146 F.3d at 884).

**39.** Id. (quoting In re Sealed Case, 146 F.3d at 887).

lege, KBR conducted this COBC internal investigation in the ordinary course of business irrespective of the prospect of litigation. KBR would not have "simply sat on its hands in the face of these allegations" because "any responsible business organization would investigate allegations of fraud, waste, or abuse in its operations."[40] Moreover, government regulations required KBR to investigate potential fraud.

The timing of the investigation compared to the actual unsealing of the lawsuit further supports the conclusion that the investigation was not conducted "in anticipation of litigation." The investigation was conducted from 2004–2006. However, the complaint in this litigation was not unsealed until 2009. Finally, the fact that the investigation was conducted by non-attorney investigators makes it harder for KBR to assert the documents were prepared in anticipation of litigation. While documents produced by non-attorneys can be protected under the work-product doctrine, the fact that non-attorneys are conducting the investigation is another indication that the documents were not prepared in anticipation of litigation.[41]

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiff–Relator Barko's motion to compel. The Court further **DENIES** the KBR Defendants' motion for leave to file a sur-reply. As such, the Court orders the KBR Defendants to produce all 89 documents relating to the COBC investigation to the Plaintiff–Relator. The Court will continue its *in camera* review and issue separate orders on the remaining documents redacted or withheld by the

KBR Defendants and the Plaintiff–Relator on privilege grounds.

IT IS SO ORDERED